RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0181p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

SOLVITA MCMILLAN,

　　　　　　*Plaintiff-Appellant,*

　　　*v.*

IDA CASTRO, Chairwoman, Equal Employment
Opportunity Commission,

　　　　　　*Defendant-Appellee.*

No. 03-4444

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 00-02052—Donald C. Nugent, District Judge.

Argued: March 10, 2005

Decided and Filed: April 19, 2005

Before: MARTIN and GILMAN, Circuit Judges; COHN, District Judge.[*]

---

## COUNSEL

**ARGUED:** Alexander M. Spater, SPATER LAW OFFICE, Columbus, Ohio, for Appellant. Annette G. Butler, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** Alexander M. Spater, SPATER LAW OFFICE, Columbus, Ohio, for Appellant. Annette G. Butler, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

---

## OPINION

---

　　　BOYCE F. MARTIN, JR., Circuit Judge. Solvita McMillan, an attorney in the Cleveland office of the Equal Opportunity Employment Commission, sued her employer in federal court alleging gender discrimination under Title VII of the Civil Rights Act of 1964 and a failure to pay her in accordance with the Equal Pay Act of 1963. At the close of McMillan's case in chief, the district court determined that it would decide McMillan's claim of wage discrimination, but would submit her Title VII claim to the jury. On December 16, 2002, the jury returned a unanimous verdict in favor of the Commission on McMillan's Title VII claim. On September 24, 2003, the district court entered judgment in favor of the Commission on McMillan's equal pay claim. McMillan now

---

[*] The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

appeals, asserting that she was denied her right to a fair trial when the district court allegedly abused its discretion by questioning her in a hostile and biased manner, and also that the district court erroneously instructed the jury regarding the term "similarly situated." Based upon a review of the entire record, we conclude that although the district court's conduct came dangerously close to tainting the fairness of McMillan's trial, a new trial is not warranted. We also conclude that the district court committed no reversible error in instructing the jury regarding the "similarly situated" concept.

## I.

McMillan, a white female, began her employment at the Cleveland Regional Office of the Equal Employment Opportunity Commission in 1981 as a trial attorney at the GS-12 level. She was promoted to the GS-13 level in 1986. In July 1996, the Commission's General Counsel, C. Gregory Stewart, determined that trial attorneys at regional offices around the country who were doing work that was "significant, complex, and difficult" should be promoted and paid at the GS-14 level. On July 19th, Stewart issued a memorandum outlining the rules for promotion from the GS-13 level to the GS-14 level. The Commission's headquarters in Washington, D.C. retained authority for final approval of promotions. The Cleveland Regional Office was headed by a regional attorney, Larry Watson. Beneath Watson were two supervisory trial attorneys, Lawrence Mays and John Sargent. Watson testified that Mays and Sargent were to identify and recommend attorneys reporting to them for promotion to the GS-14 level. Sargent was McMillan's immediate supervisor. In August 1996, based on the memorandum, McMillan asked Sargent to submit a promotion recommendation on her behalf because, according to her testimony, she "had been performing GS-14 level work since the 1980s." McMillan testified that Sargent agreed and said he would consult with Watson. According to McMillan, she followed up with Sargent who informed her that he did not have authority to act on the matter. Thereafter, McMillan periodically followed up with Sargent to see if he would prepare a recommendation for her.

In May 1997, McMillan learned that back in December 1996 an individual named Jeffrey Stern had been recommended for a promotion to the GS-14 level by his immediate supervisor, Mays. Despite the submission, Watson did not send the recommendation to headquarters for final approval. Upon discovering that a promotion recommendation had been prepared for Stern, McMillan confronted Sargent and again requested that he recommend her for promotion. McMillan testified that Sargent informed her that the Commission's failure to promote her was not a result of any inaction on his part, and within a few days he prepared and submitted a memorandum to Watson recommending McMillan for promotion. McMillan requested a meeting with Watson to discuss the matter at which she testified Watson informed her that he would send her promotion recommendation to headquarters, but would not make the request retroactive because she was not "emotionally ready to be a GS-14 at the time the 14 slots were first authorized."

Watson thereupon concurred in Sargent's recommendation of McMillan and forwarded it to headquarters along with Mays's recommendation of Stern. Before the promotions were approved, however, a freeze went into effect. Approximately a year later, on June 26, 1998, Stewart issued another memorandum, this time allowing the regional attorney, Watson, to sign off on promotions of attorneys from the GS-13 to the GS-14 level. McMillan and Stern were again recommended by their respective immediate supervisors; Watson approved McMillan's promotion in August 1998 and approved Stern's promotion several months later.

McMillan's Title VII claim was essentially that she and Stern were similarly situated and she was discriminated against based on her gender when Stern received consideration for promotion in December 1996 and she was not considered until May 1997, despite the fact that she ultimately received her promotion before Stern.

McMillan also asserted a claim under the Equal Pay Act of 1963 based on a disparity in pay for allegedly equal work by her and Charles Guerrier, a GS-14 attorney in the office. In 1988, a GS-14 position was created by the Commission for the Cleveland office and Charles Guerrier was promoted to fill the position. The basis of McMillan's equal pay claim is that from approximately 1991 through 1998, she and Guerrier were doing the same work for unequal pay and that the Equal Pay Act required the Commission to create another GS-14 position or reduce the complexity of her work.

## II.

### A. *District Court's Conduct During McMillan's Testimony*

On appeal, McMillan claims that the district court's questioning of her during the trial was hostile and biased and therefore an abuse of discretion that denied her right to a fair trial. According to McMillan, the district court "belittled her and interrupted her answers" and "misrepresented the evidence in a way that was biased against [her]." McMillan points to several pages in the transcript where the district court extensively questioned her regarding the facts of her claims, and specific instances where the district court appeared less-than-cordial. For example, the district court cut McMillan's answers short on occasion, asserting that it was merely asking "a simple question." The district court also questioned whether it and McMillan were "speaking the same language," ended a line of questioning with "[t]hat's it? That's your case?," and once suggested that McMillan's attorney had "keyed" her in on an answer. The morning following McMillan's testimony, her counsel moved for a mistrial based on the district court's "onerous interrogatories." McMillan asserted that the district court "move[d] into the role of an advocate rather than the Judge." The district court responded that "[s]he wouldn't answer my question," told counsel that "[i]t's a matter of interpretation, isn't it?" and overruled McMillan's motion.

This Court reviews a district court's conduct during a trial for an abuse of discretion. *Nationwide Mut. Fire Ins. Co. v. Ford Motor Co.*, 174 F.3d 801, 805 (6th Cir. 1999). We have stated that a trial judge is the "governor of the trial" and is charged with "assuring that the trial runs smoothly and [] is free to ask questions for the purpose of clarifying the testimony and to elicit the truth." *Id.* at 805 (citing *United States v. Hickman*, 592 F.2d 931, 933 (6th Cir. 1979)). In doing so, however, the district judge must "always be calmly judicial, dispassionate and impartial. He should sedulously avoid all appearances of advocacy as to those questions which are ultimately to be submitted to the jury." *Hickman*, 592 F.2d at 933 (quoting *Frantz v. United States*, 62 F.2d 737, 739 (6th Cir. 1933)).

Actual impartiality as well as the appearance of impartiality is "critical because the judge's every action is likely to have a great influence on the jury." *Nationwide*, 174 F.3d at 805. An indication by the trial court of "outright bias or belittling of counsel is ordinarily reversible error," *id.* at 808, and it is also reversible error if the trial "was so infected with the appearance of partiality" that the trial court's interjections must "inevitably have left the jury" improperly influenced, *id.* More specifically, "the harmless error doctrine is inapplicable in cases where judicial bias and/or hostility is found to have been exhibited at any stage of a judicial proceeding." *Id.* (quoting *Anderson v. Sheppard*, 856 F.2d 741, 746-47 (6th Cir. 1988)). The *Hickman* panel did mention the possibility that in some cases judicial misconduct might not merit reversal, but the only case cited was where the majority of the trial court's comments were "out of the presence of the jury, were provoked by the conduct of counsel, and were directed against both sides." *Hickman*, 592 F.2d at 934 (citing *United States v. Weiss*, 491 F.2d 460, 467-68 (2d Cir.), *cert. denied*, 419 U.S. 833 (1974)).

While "[w]e do not look with favor on extensive examination of witnesses by the trial judge in a jury trial," *United States v. Carabbia*, 381 F.2d 133, 139 (6th Cir. 1967), a trial court may

nonetheless interject itself into the proceedings when "necessary to clear up confusion in the evidence or to supplement, in an impartial fashion, the presentation of a poorly prepared attorney," *Nationwide*, 174 F.3d at 808. Given the district court's role in governing the trial, combined with the reality that "potential prejudice lurks behind every intrusion into the trial made by a presiding judge[,] . . . determining when a trial judge oversteps is difficult." *Hickman*, 592 F.2d at 933. Thus, in *Hickman*, we pointed to some of the relevant considerations to aid in making the determination. "First, the nature of the issues at trial. In a lengthy, complex trial, intervention by the judge is often needed to clarify what is going on." *Id.* "Second, the conduct of counsel. If the attorneys in a case are unprepared or obstreperous, judicial intervention is often called for." *Id.* "Third, the conduct of witnesses. It is often impossible for counsel to deal with a difficult witness without judicial intervention." *Id.* Even if these conditions present "good reason to interject [the district court] into the trial, the manner in which [it] does so is crucial." *Id.* In addition, this Court has considered the tone of the judicial interruptions, the extent to which they were directed at one side more than the other, and the presence of any curative instructions at the close of the proceedings. *United States v. Tilton*, 714 F.2d 642, 645 (6th Cir. 1983).

In sum, while we employ an abuse of discretion standard in determining whether the district court's conduct was hostile or biased, once we have concluded that judicial misconduct did occur, reversal is automatic due to the structural nature of the error. *See Nationwide*, 174 F.3d at 805; *see also Arizona v. Fulminante*, 499 U.S. 279, 309 (1991) (listing judicial bias as an example of errors not subject to harmless error analysis). Thus, the threshold inquiry is whether, with reference to a range of acceptable, though not necessarily model, judicial behavior, the district court's conduct falls demonstrably outside this range so as to constitute hostility or bias.

In *Nationwide*, this Court held that several instances of judicial misconduct constituted bias and therefore warranted reversal. In that case the district court interrupted the plaintiff's opening statement six times, twice cut short plaintiff's counsel's description of the case, twice more interrupted plaintiff's counsel with questions, made significant interruptions and cross-examinations of the plaintiff's witnesses, questioned the plaintiff's witnesses about matters unrelated to the scope of direct examination, admonished plaintiff's witnesses for not being short enough in answering questions, repeatedly suggested to defense counsel that he ought to register objections to certain testimony, actually pointed at defense counsel prompting him to object, and was "consistently derisive in tone and content" of the plaintiff's theory of the case. *Nationwide*, 174 F.3d at 805-09.

In *Hickman*, this Court reversed and remanded for a new trial after the district court injected itself into the proceedings more than two hundred-fifty times in a one-day trial. *Hickman*, 592 F.2d at 932. Moreover, the district court "would [s]ua sponte interrupt a witness or counsel, with the words 'objection sustained' and then proceed to state why the witness'[s] particular testimony was, in some way objectionable." *Id.* at 934. The district court also interrupted counsel's opening argument, questioned witnesses beyond the nature and scope of direct examination, rehabilitated one witness's testimony, and essentially assumed the role of the prosecutor. *Id.* at 934-35. The district court expressed "contemptuous disbelief" when the final defense witness was called and the anti-defendant bias of the district court was "strongly inferable" from the record. *Id.* at 936.

By contrast, this Court held there was no abuse of discretion by the district court in *Tilton*, where the district court actively interrupted counsel nearly thirty times. 714 F.2d at 644. This Court stated that while the district court's behavior "was far from desirable" and that the Court was "unwilling to condone it," the district court's actions did not "so clearly cross[] the line to reach that area of impermissible and prejudicial behavior which would warrant reversal." *Id.*

Furthermore, where a district court posed approximately two hundred-fifty questions during a one-month trial, allegedly engaged in partisan interrogation of witnesses, and allegedly made prejudicial comments on the significance of evidence, this Court held that conduct not to be an abuse

of discretion. *United States v. Smith*, 561 F.2d 8 (6th Cir. 1977). In *Smith*, the issues were complex, the district court issued a curative instruction not to infer bias from its questioning, and the mere fact that the information elicited by the court proved damaging to the appellant's case was not sufficient to automatically render the district court biased, where both sides were questioned to an approximately equal extent. *Id.* at 13-14.

Likewise, in another *United States v. Smith*, 831 F.2d 657 (6th Cir. 1987), this Court held that the district court's questioning of a witness to clarify an answer was not reversible error and pointed to both a pre-trial instruction and curative instruction at the close of evidence that the jury was not to infer the district court's opinion from any of its actions. *Id.* at 663-64. Specifically, the district court stated at the beginning of the proceedings that no action on its part "is intended to indicate my opinion as to how you should decide the case, or to influence you in any way." *Smith*, 831 F.2d at 663. The instruction at the close of evidence reiterated: "The court has the right, and indeed the duty, to see that facts are clearly presented, and my purpose in asking questions was to clarify certain matters in the case. Again – and I emphasize this as strongly as I know how – you are not to draw any conclusion that by my interrogation of any witness I have intended to convey any point of view as to the witnesses' credibility." *Id.* at 664.

The district court's behavior in the present case falls somewhere between that of the courts in *Hickman* and *Nationwide*, where misconduct was found and therefore a new trial was warranted, and the behavior in *Tilton* and *Smith*, where the conduct was less than desirable but was deemed not hostile or biased. Here, while the district court interjected itself into the case only during the testimony of one witness and its presence did not "permeate[]" the trial, *Hickman*, 592 F.2d at 934, the district court's tone toward McMillan bordered on condescending. *See Nationwide*, 174 F.3d at 808.

If the district court's conduct throughout the entire trial had been on par with its conduct during McMillan's testimony, we would not hesitate in finding hostility and bias and would remand for a new trial. Based on our review of the entire transcript, however, we conclude that a new trial is not warranted. While we will not condone the district court's conduct and tone with McMillan, we are not convinced that the district court's behavior falls so far outside the range of permissible judicial conduct so as to be characterized as biased or hostile. Throughout the course of the entire trial, numerous witnesses testified both on behalf of McMillan and on behalf of the Commission, without inference from the district court. Those that testified on behalf of McMillan testified to the same facts as McMillan, without challenge or comment by the district court. Moreover, the district court did issue a curative instruction at the close of the evidence, telling the jury that "you are to exercise your own judgment without regard to anything the Court may have said or done here during the course of the trial . . . . You're not to consider anything having indication of my view on the case whatsoever by any questions that I may or may not have asked."

Overall, the district court's tone toward McMillan and its apparent off-the-cuff comments are troubling. Nevertheless, we do not believe the district court's conduct exhibited judicial hostility or bias and did not inevitably influence the jury. We therefore conclude that in this particular case, the district court's less-than-model behavior did not rise to the level of demonstrating hostility or bias and we accordingly find that the district court did not abuse its discretion.

We find it necessary, however, to take this opportunity to emphasize that district courts must always be mindful of their conduct in the presence of the jury and should take necessary precautions to prevent appearing partial to one side. While it was certainly proper for the district court here to issue a curative instruction to the jury at the close of the evidence, we believe that in the future, district courts should issue a curative instruction at the time counsel raises an objection to specific questioning or conduct that could be viewed as hostile or biased. In this case, McMillan's counsel requested a mistrial the morning after McMillan was questioned by the district court, and the district

court denied the motion. District courts, in similar circumstances, should ask counsel what remedy, short of a mistrial, would be appropriate, and give due consideration to whether an immediate curative instruction or other remedy can cure any appearance of hostility or bias.

### B. *Jury Instructions*

McMillan's second argument on appeal is that the district court committed reversible error in instructing the jury that she and Stern must have "dealt with the same supervisor" in order to be deemed "similarly situated." The district court's jury instructions provided, in pertinent part, as follows:

> When determining whether Plaintiff was treated differently than members outside the protected class, i.e., men, only such men found to be, quote, similarly situated, closed quote, to Plaintiff are to be considered. In this case, Plaintiff claims Jeffrey Stern was similarly situated to her. The Defendant's treatment of individuals who are not similarly situated is irrelevant and should not be considered by you.
>
> To be deemed similarly situated, *the individual with whom Plaintiff seeks to compare her treatment must have dealt with the same supervisor*, been subject to the same standards, and engaged in the similar conduct, without such differentiating or mitigating circumstances that would distinguish their conduct or employers' treatment of them for it.
>
> Similarly situated means the same or substantially similar background, education, experience, job responsibilities, and performance. Similarly situated means job responsibilities that require the same skill and ability and/or job responsibilities that are equal and interchangeable.

McMillan objected to the italicized portion of these instructions, arguing that the requirement that she and Stern "must have dealt with the same supervisor" to be deemed similarly situated is irrelevant in this particular case. McMillan acknowledged that she and Stern dealt with different immediate supervisors, but maintained that that fact was irrelevant to her claim because the ultimate decision-maker, regional attorney Watson, was in charge of all attorneys in the Commission's Cleveland Office. Thus, McMillan urged the district court to strike the "same supervisor" requirement and replace it with a requirement that she and Stern must have dealt with the same "ultimate decision-maker." The Commission opposed McMillan's suggested changes to the jury instructions, and the district court ultimately refused to modify the instructions as she had requested.

"Appellate courts do not review jury instructions for technical error." *Cox v. Treadway*, 75 F.3d 230, 234 (6th Cir. 1996). Instead, we "'review the jury charge as a whole to determine whether it fairly and adequately submits the issues and the law to the jury.'" *Id.* (quoting *United States v. Carr*, 5 F.3d 986, 992 (6th Cir. 1993)).

> A refusal to give a requested jury instruction is reversible error only if three conditions are satisfied. First, the omitted instruction must be a correct statement of the law. Second, the instruction must not be substantially covered by other delivered charges. Third, the failure to give the instruction must impair the requesting party's theory of the case.

*Id.* (citing *Carr*, 5 F.3d at 992).

In *Mitchell v. Toledo Hospital*, we held that "to be deemed 'similarly-situated', the individuals with whom the plaintiff seeks to compare his/her treatment *must have dealt with the same supervisor*, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the

employer's treatment of them for it." 964 F.2d 582, 583 (6th Cir. 1992) (emphasis added). We have since clarified that "*Mitchell* itself only relied on those factors relevant to the factual context in which the *Mitchell* case arose—an allegedly discriminatory disciplinary action resulting in the termination of the plaintiff's employment." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). Although "[t]hese factors generally are all relevant considerations in cases alleging differential disciplinary action," we explained,

> [c]ourts should not assume . . . that the specific factors discussed in *Mitchell* are relevant factors in cases arising under different circumstances, but should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee. The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered "similarly-situated;" rather, as this court has held in *Pierce* [*v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)], the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in "all of the *relevant* aspects."

*Id.* (citation and footnote omitted).

Indeed, we have held, relying on *Ercegovich*, that a plaintiff claiming racial discrimination was similarly situated to a non-protected employee even though the two individuals "worked in different . . . departments and *had different supervisors*." *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 479 (6th Cir. 2003) (emphasis added). In so holding, we recognized *Mitchell*'s "same supervisor" language, but explained that that particular criterion "has never been read as an inflexible requirement" and was not relevant to the plaintiff's claim in that case. *Id.* at 479-80. The fact that the two individuals had different supervisors did not prevent them from being deemed similarly situated, we reasoned, because "all of the people involved in the decision-making process, including Plaintiff's immediate supervisor and the department manager, were well-aware of the discipline meted out to past violators, including [the non-protected employee], who had violated the policy on at least two occasions." *Id.* at 480.

It is clear from the foregoing that the requirement that a plaintiff and her comparator "must have dealt with the same supervisor" to be considered similarly situated does not automatically apply in every employment discrimination case. Whether that criterion is relevant depends upon the facts and circumstances of each individual case. In this case, it probably would have been more appropriate for the district court to instruct the jury that, in order to be considered similarly situated, McMillan and Stern must have dealt with the same ultimate decision-maker, rather than the same supervisor. Nevertheless, in our view, the manner in which the district court instructed the jury does not constitute reversible error.

McMillan is undoubtedly correct that whether or not she and Stern dealt with the same *immediate* supervisor, which they clearly did not, is wholly irrelevant to her claim. The instructions given in this case, however, provided only that they must have dealt with the same *supervisor*. The district court recognized this distinction and even suggested that McMillan argue to the jury that the term "supervisor" included not just Sargent and Mays, who were McMillan and Stern's respective immediate supervisors, but also regional attorney Watson, who oversaw the entire Cleveland Regional Office. We agree that under the facts of this case the term "supervisor" is broad enough to encompass Sargent and Mays as well as regional attorney Watson. Moreover, a review of the record indicates that the issue of whether McMillan and Stern dealt with the same supervisor was relatively insignificant to the case. Indeed, there is no indication that the Commission ever argued that McMillan and Stern were not similarly situated because they did not deal with the same supervisor.

All of this leads us to conclude that, under the facts of this particular case, the district court's jury instructions fairly and adequately submitted the issues and the law to the jury and its refusal to give McMillan's requested instruction did not impair her theory of the case.  *See Cox*, 75 F.3d at 234.

**III.**

For these reasons, the district court's judgment is AFFIRMED.