**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0956n.06

**No. 11-5099**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| STEVEN HELFRICH, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellant, | ) | ***Aug 29, 2012*** |
| | ) | LEONARD GREEN, Clerk |
| v. | ) | |
| | ) | |
| LAKESIDE PARK POLICE DEPARTMENT; | ) | |
| CITY OF LAKESIDE PARK; LAKESIDE PARK | ) | |
| CRESTVIEW HILLS POLICE AUTHORITY, | ) ON APPEAL FROM THE UNITED | |
| | ) STATES DISTRICT COURT FOR THE | |
| Defendants, | ) EASTERN DISTRICT OF KENTUCKY | |
| | ) | |
| and | ) OPINION | |
| | ) | |
| OFFICER MIGUEL RODRIGUEZ, Individually, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| _____ | ) | |

Before: MOORE, SUTTON, and STRANCH, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** This excessive-force case arises out of Officer

Miguel Rodriguez's tasing of Steven Helfrich, which occurred while Rodriguez was attempting to

place Helfrich into a police car after arresting him. Helfrich sued Rodriguez for, among other things,

excessive force and false arrest under 42 U.S.C. § 1983, assault and battery under Kentucky law, and

punitive damages. After various pretrial and trial rulings winnowing his claims, his excessive-force,

assault, and battery claims were tried to a jury, which determined that Rodriguez did not use

excessive force or commit assault and battery in arresting Helfrich and placing him in the car.

Helfrich appeals, arguing that the district court committed several evidentiary errors that warrant vacating the judgment and remanding for a new trial. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A.      The wedding

Helfrich traveled to northern Kentucky to attend his cousin's wedding on August 8, 2008. Because the wedding was open bar and transportation was provided, Helfrich acknowledged that he could drink more liberally and that from about 3 p.m. at the wedding and through the early morning hours at the hotel bar afterwards, he had at least 8 drinks. But Helfrich claims that he was not drunk when he left the hotel bar and went to the pool area at around 2 or 2:30 a.m.[1] A large group of people were gathered in the pool area, including several wedding guests.

### B.      The arrest and tasing

Meanwhile, at around 2:30 a.m., Rodriguez was dispatched to the hotel to assist another police department on a disorderly persons call. He arrived at the hotel, spoke with the manager, and then went to the pool area, where he saw a group of about 50 people, some of whom had been drinking. He ordered the group to go back to their rooms twice, but only a few people complied. So Rodriguez then asked the crowd, "Who needs to be made an example of?"

Rodriguez and Helfrich's testimony begin to diverge at this point, so we summarize each version in turn. In response to Rodriguez's question, he heard someone behind him say, "I'll be your

---

[1] Helfrich denied having a problem with alcohol, but admitted that his family physician Dr. Ayers advised him to avoid alcohol and diagnosed him with a history of alcohol abuse.

example." He turned and spotted Helfrich. Rodriguez testified that he approached and ordered Helfrich to go to his room twice, but Helfrich refused both orders. Then, noticing that Helfrich smelled of alcohol, Rodriguez told him that he was under arrest for alcohol intoxication and disorderly conduct. According to Rodriguez, Helfrich refused to comply, and the two men struggled as Rodriguez attempted to place Helfrich under arrest. The pool group started crowding around the two men and yelling and got so close that Rodriguez realized that he needed backup. Then, the bride ran up and got between him and Helfrich, and he released Helfrich. Because Rodriguez felt the situation was escalating and getting dangerous, he drew, but did not deploy, his taser and ordered Helfrich to get on the ground or he would be tased.

Shortly after this, Sergeant Tom Loos arrived in the pool area and screamed to get the crowd's attention. With the crowd distracted, Rodriguez was able to handcuff Helfrich, who threatened to "kick his ass," and begin escorting him outside. Loos heard this threat as well. Once outside, Helfrich calmed down and they had a brief conversation. Helfrich complained that his handcuffs were too tight, so Rodriguez loosened them. He patted Helfrich down and attempted to place him in his police car. Helfrich ignored at least two of his orders to get into the car, so Rodriguez pushed him down into the seat. When Helfrich sat down, he kicked Rodriguez in the knee and, despite a warning from Rodriguez to stop it, kicked him again. So Rodriguez tased Helfrich on his shoulder and placed him in the car. Rodriguez believed that his use of the taser under these circumstances was consistent with Lakeside Park-Crestview Hills Police Authority (LPCHPA) policy.

Officers Latorsa Humphrey and Dave Lillich responded to the disorderly persons call at the hotel as well. They assisted Rodriguez at his police car and saw Helfrich argue with Rodriguez and

refuse his orders to get into the car. In addition, they saw Helfrich kick his feet as Rodriguez was trying to push him into the car. Lillich confirmed that one of the kicks landed on Rodriguez's leg. Humphrey and Lillich saw Rodriguez tase Helfrich after he began kicking.

After Helfrich was in the car, Rodriguez called an EMT and his supervisor as required by LPCHPA policy. David Slusher, an EMT responded and examined Helfrich. Although Helfrich's heart rate was elevated when Slusher arrived, it reduced significantly after a few minutes. Slusher offered to take Helfrich to the hospital, but he refused treatment. In addition to Slusher, Rodriguez's supervisor came and interviewed several witnesses (including Helfrich and Rodriguez) regarding the use of force.

After Slusher finished examining Helfrich, Rodriguez escorted him to the jail. Jessica Sims, deputy jailer, completed an intake assessment form for Helfrich when he was booked. Although the question on the form asking whether the inmate engaged in violent behavior was marked "no," Sims could not recall asking Rodriguez this question during booking, something that she usually does. Sims testified that "it's very possible" that she made a mistake in filling out the form, especially since 3:45 a.m. on a Saturday night tends to be a busy time for the jailers. For his part, Rodriguez denied telling the booking officer that Helfrich had not engaged in violent behavior.

After delivering Helfrich to the jail, Rodriguez went to a hospital to have the knee that had been kicked examined. The doctor told him that he had a contusion on his knee caused by blunt-force trauma. The hospital record of this visit was received into evidence at the trial, but does not appear in the record on appeal. Portions of the medical record from Rodriguez's trip to the hospital were read to the jury, and these portions confirm that the doctor diagnosed him as having a swollen knee, "consistent with a mild to moderate contusion."

Helfrich's testimony regarding his arrest and tasing is somewhat different. In response to Rodriguez's question at the pool area—"Who wants to be my first example?"—Helfrich joked by saying about his cousin, "she'll be your first example." Rodriguez then approached Helfrich and immediately told him that he was under arrest. Helfrich repeatedly asked why. Once Rodriguez drew his taser and pointed it at Helfrich, he got on his knees and allowed Rodriguez to handcuff him. Helfrich denies threatening to kick Rodriguez's ass. Members of Helfrich's family testified that Helfrich did not appear intoxicated that night, that Helfrich cooperated with Rodriguez, and that Rodriguez did not tell Helfrich why he was being arrested.

Helfrich agrees that he and Rodriguez had a cordial conversation once they were outside by the car. But he disagrees with how Rodriguez described the tasing. Helfrich testified that he responded to Rodriguez's orders to get in the car by asking why he was being arrested. Rodriguez then warned him to get in the car or he would be tased. Seconds later, Rodriguez tased him. In response to questioning by the judge, Helfrich testified that he again asked why he was being arrested after Rodriguez warned him to get in the car or be tased, and that it was only after this question that he was tased. After being tased, he fell into the car. He testified that Rodriguez then brandished the taser in his face and he scooted back into the car. An EMT arrived and examined him. Then he was taken to the jail.

Helfrich was charged with third-degree assault, disorderly conduct, alcohol intoxication, and resisting arrest. The plea bargain he entered into with the state dismissed the assault charge and merged the alcohol-intoxication and resisting-arrest charges into the disorderly conduct charge, to which Helfrich pled guilty.

**C.    Helfrich's civil suit**

Helfrich sued Rodriguez in November 2008 and, in an amended complaint, also sued the LPCHPA.  After discovery, both parties moved for summary judgment, which the district court granted to Rodriguez and LPCHPA on all of Helfrich's claims except for the excessive-force, assault, and battery claims against Rodriguez.  As a result of the summary-judgment rulings, the court dismissed LPCHPA as a party to the action and set Helfrich's remaining claims for a jury trial in December 2010.

*1.    Rodriguez's requests to exclude evidence*

Before trial, Rodriguez objected to admitting testimony (1) from Helfrich about his plea bargain to the criminal charges and (2) from Kaleb Clark.  With respect to (1), the district court ruled that the plea could be used for impeachment purposes if either party opened the door to it.  Despite this ruling, Helfrich's attorney mentioned the criminal charges during his opening statement.  But because Rodriguez never mentioned the criminal charges in his direct-examination testimony, the court found that the door was never opened for Helfrich to admit evidence about the plea.  Based on its ruling that evidence about the plea could be used only if the opposing party opened the door (and then only for impeachment purposes), the court prevented Helfrich from testifying about his criminal charges.

Helfrich wanted Kaleb Clark to testify about being tased by Rodriguez two nights before Rodriguez arrested and tased Helfrich.  The court excluded this evidence for two primary reasons: (1) it constituted impermissible character evidence that was not admissible for another purpose under Rule 404(b) of the Federal Rules of Evidence, and (2) it "would be unduly prejudicial and likely to confuse the jury" under Rule 403.

    2.     *Helfrich's requests to exclude evidence*

Before trial, Helfrich moved to exclude evidence regarding his prior convictions for driving under the influence of alcohol in 2004 and for disorderly conduct in 2001. The district court ruled that it would exclude evidence regarding the prior convictions unless Helfrich opened the door by claiming that he "always had an exemplary record" or that the arrest emotionally affected him. In his opening statement, Helfrich's attorney extolled his character, and Helfrich' direct testimony relayed that he had excellent character and that the arrest embarrassed him greatly. The court found that Helfrich's testimony and the opening statement had opened the door and it therefore allowed evidence of Helfrich's prior arrests to come in for impeachment purposes. Rodriguez's attorney cross-examined Helfrich briefly about these prior arrests to impeach Helfrich's testimony that the arrest embarrassed him in front of his family and besmirched his good name.

    3.     *Helfrich's punitive-damages claim*

After Rodriguez presented his case, he moved for judgment as a matter of law on Helfrich's punitive-damages claim and the motion was granted. The next day, the court denied Helfrich's motion to reconsider, reasoning that there was no evidence that Rodriguez's conduct rose to the level of gross negligence, which was necessary in the court's view to support a punitive-damages claim.

    4.     *The verdict*

Two interrogatories were submitted to the jury regarding liability: the first asked whether Rodriguez had used excessive force "in arresting [Helfrich] and placing him in the cruiser"; the second, whether Helfrich kicked Rodriguez before being tased. The jury found in Rodriguez's favor on both issues and this timely appeal followed.

## II. ANALYSIS

### A.     Testimony of Kaleb Clark

The first issue is whether the district court committed reversible error by refusing to admit the testimony of Clark, who had been tased by Rodriguez two nights before the Helfrich arrest and tasing. The court excluded this evidence of another (allegedly bad) act for two independent reasons. First, it was not admissible for a proper purpose under Rule 404(b) because its probative force hinged upon impermissible propensity reasoning—the allegedly unreasonable tasing of Clark served to prove that Rodriguez was the sort of person who would tase without sufficient cause, which in turn tended to show that he tased Helfrich without sufficient cause. *See* Fed. R. Evid. 404(b). Second, the evidence would be unduly prejudicial and likely to confuse the jury under Rule 403.

Rule 404(b)(1) prevents other-acts evidence from being offered "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." But that evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. Rule 404(b)(2). Before the district court

> may admit 404(b) evidence, it must: (1) determine whether this is sufficient evidence
> that the prior acts occurred; (2) determine whether the other act is admissible for one
> of the proper purposes outlined in the rule; and (3) apply Rule 403 balancing to
> determine whether the probative value of the evidence is substantially outweighed
> by the danger of unfair prejudice.

*United States v. Hardy*, 643 F.3d 143, 150 (6th Cir. 2011). We review the district court's decision under the three-prong test using the following standards of review: clear error on the first prong, de

novo on the second, and abuse of discretion on the third.[2] *United States v. Johnson*, 27 F.3d 1186, 1190 (6th Cir. 1994). The first prong of the test is not an issue on appeal because neither party disputes that Rodriguez tased Clark.

Turning to the second prong, Helfrich argues that Clark's testimony is offered for the purpose of establishing Rodriguez's plan and intent. Evidence is admissible for a proper purpose under Rule 404(b) if (1) the purpose for which it is offered is in issue, (2) it is probative of that purpose, and (3) the purpose is something other than proving conduct in conformity with character. *Hardy*, 643 F.3d at 150. Helfrich argues that Clark's testimony would show that Rodriguez followed a plan to justify unreasonable tasings by claiming self defense and then charging the people tased with felonies "that were immediately dismissed upon a plea to [a] minor misdemeanor, thereby precluding the chance that the arrest would be challenged civilly." In essence, the plan is a method Rodriguez employs to get away with using excessive force.

Helfrich's argument that the word *plan* in Rule 404(b) would encompass this other act or other-acts evidence similar to it is undercut by our explanation that *plan* normally requires that the other acts be either prefatory steps to the conduct at issue or part of a larger conspiracy. *See United States v. Merriweather*, 78 F.3d 1070, 1077 (6th Cir. 1996) ("*Preparation* and *plan* were not in issue; it was impossible to assert that Merriweather's dealings with Jones were prefatory steps to dealing with Bender or part of a plan to deal with Bender."); *Johnson*, 27 F.3d at 1194 ("[P]reparation

---

[2]Authority is split over the precise standard of review to be used on each prong. *Compare Johnson*, 27 F.3d at 1190 (applying clear error on the first prong, de novo on the second, and abuse of discretion on the third), *with Hardy*, 643 F.3d at 150 (applying the abuse-of-discretion standard to all three prongs). But we need not decide this issue because Helfrich's arguments fail even under the more lenient de novo standard that some cases apply on the second prong.

or plan were not in issue. There was no suggestion, for example, in the government's theory of the case that the other acts were preliminary steps necessary to the success of a greater, overall criminal enterprise.").

Moreover, *Merriweather*'s reasoning is consistent with the reasoning of other circuits. The Second Circuit rejected other-acts evidence offered for proving plan because the other-acts evidence and the acts underlying the charged crime "were not part of a connected or inseparable transaction, in which all the crimes figured, nor do they constitute a continuing scheme or conspiracy." *United States v. Manafzadeh*, 592 F.2d 81, 88 (2d Cir. 1979); *see United States v. Dothard*, 666 F.2d 498, 502 (11th Cir. 1982) (reasoning that other-acts evidence may be admitted to show plan "only if [the other act] is 'so linked together in point of time and circumstances with the crime charged that one cannot be shown without proving the other'" (quoting *United States v. Beechum*, 582 F.2d 898, 912 (5th Cir. 1978))); *Becker v. ARCO Chemical Co.*, 207 F.3d 176, 196 (3d Cir. 2000) ("Ordinarily, when courts speak of common plan or scheme, they are referring to a situation in which the charged and the uncharged acts are parts of a single series of events. In this context, evidence that the defendant was involved in the uncharged act may tend to show a motive for the charged act and hence establish the commission of the act, the identity of the actor, or his intention." (ellipses, brackets, and internal quotation marks omitted)).

Helfrich has offered no evidence that Rodriguez's tasing of Clark was a prefatory step to his tasing of Helfrich, that the two tasings were part of a connected transaction, or that they were part of a larger conspiracy on the part of Rodriguez regarding tasing. In light of the authority construing *plan* under Rule 404(b), his failure to do so undermines his claim that the Clark evidence is admissible to show plan. Instead, what the Clark testimony would go to prove is that Rodriguez is

the sort of person who would unjustifiably tase someone, which tends to show that his tasing of Helfrich is also unjustified. This is precisely the sort of propensity reasoning Rule 404(b) forbids. The district court correctly determined that the Clark testimony was not admissible to show plan.

Helfrich's claim that the evidence goes to Rodriguez's intent fares little better. An excessive-force claim under federal law requires the factfinder to decide whether the force the officer used was objectively reasonable in light of the totality of the circumstances confronting the officer. *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). Because the standard is objective, the officer's actual motives in using a particular degree of force are irrelevant: "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional."[3] *Id.* at 397. So evidence tending to reveal Rodriguez's subjective state of mind is irrelevant to Helfrich's federal excessive-force claim and therefore excludable under Rule 402. *Tanberg v. Sholtis*, 401 F.3d 1151, 1168 (10th Cir. 2005) (holding that evidence of other occasions when the officer allegedly used excessive force was inadmissible to prove intent with respect to the plaintiff's excessive-force claim under federal law).

The same may not be true of Helfrich's claim for assault and battery under state law. Section 503.090 of the Kentucky Revised Statutes provides, in relevant part, that "[t]he use of physical force by a defendant upon another person is justifiable when the defendant, acting under

---

[3]*Graham* recognized one exception to this rule: "in assessing the credibility of an officer's account of the circumstances that prompted the use of force, a factfinder may consider, along with other factors, evidence that the officer may have harbored ill-will towards the citizen." *Graham*, 490 U.S. at 399 n.12. But the Clark evidence does not show that Rodriguez harbored ill-will towards Clark, much less Helfrich.

official authority, is making or assisting in making an arrest, and he: (a) *Believes* that such force is necessary to effect the arrest." (Emphasis added.) The word *believes* implies that the officer's subjective state of mind is relevant to whether the force used is justifiable under Kentucky law. And yet in a case involving a wrongful-death claim brought on behalf of an individual who died from injuries sustained during a SWAT team raid, the court applied a standard which appears to be objective: an officer "is entitled to use such force as is necessary, or reasonably appears so, to take a suspect into custody." *Haugh v. City of Louisville*, 242 S.W.3d 683, 686 (Ky. App. 2007).

We need not resolve this issue because the district court's alternative ground for excluding the evidence is adequate. The court held that the evidence was inadmissible under Rule 403 because its probative value would be substantially outweighed by the danger of unfair prejudice, confusing the jury, and undue delay. "Under Rule 403, a district court is granted very broad discretion in determining whether the danger of undue prejudice outweighs the probative value of the evidence." *United States v. Fisher*, 648 F.3d 442, 449 (6th Cir. 2011) (internal quotation marks omitted).

Admitting Clark's testimony would cause delay and distract the jury from the issue of whether Rodriguez used excessive force in arresting Helfrich. Although Clark's affidavit asserts that he did nothing to warrant getting tased, the Use of Force Investigative Supplement prepared by Sergeant Bihl—which concludes that Rodriguez did not use excessive force—tells a different story. According to those reports, Clark was running away from Rodriguez, but then started to turn around in an aggressive manner just before he was tased. Rodriguez's typed statement about the Clark tasing indicates that one taser barb struck Clark in the rib and the other struck him in the back, which would be consistent with the tasing occurring as Clark turned around. Thus, the Clark evidence is not as clear as Helfrich suggests. A trial within this trial would be necessary for the jury to determine

whether Rodriguez used excessive force in arresting Clark. And though the tasings were only two days apart, the facts underlying each are different, as are the techniques that Rodriguez employed—taser barbs verses drive stun mode. Helfrich's charged felony (assault) involved violence and stemmed from conduct that occurred before the tasing; Clark's charged felony (bribery) did not involve violence and stemmed from conduct that occurred after the tasing. These differences detract from the relevance of the Clark tasing. *See Tanberg*, 401 F.3d at 1169. Moreover, this evidence is of insufficient probative value in enhancing the truth of Helfrich's story in light of the testimony of other witnesses and the objective medical evidence that Rodriguez's knee suffered a blunt-force trauma, such as a kick.

In sum, the evidence's probative value was slight, but it created a substantial danger of undue delay, unfair prejudice, and confusing the jury. The district court did not abuse its discretion in excluding the evidence under these circumstances.

**B.      Questioning Helfrich about his prior arrests**

The next issue is whether the district court committed reversible error when it allowed Rodriguez's counsel to impeach Helfrich by cross-examining him regarding his prior *arrests* (one for driving under the influence of alcohol and two for disorderly conduct). Because the issue involves an evidentiary ruling, we employ an abuse-of-discretion standard of review. *Nolan v. Memphis City Schools*, 589 F.3d 257, 264 (6th Cir. 2009). Even if a district court's evidentiary ruling constitutes an abuse of discretion, a new trial is not warranted if the error is harmless. *Id.* at 264-65.

When a party offers evidence of his good character, he opens the door for the opponent to admit rebuttal evidence of his prior bad acts. *United States v. Savoca*, 151 F. App'x 28, 30 (2d Cir.

2005) ("[A]ppellant's introduction of character testimony opened the door to the Government's evidence of prior bad acts."); *Nelson v. Lis*, No. 09 C 883, 2011 WL 4460492, at *6 (N.D. Ill. Sept. 27, 2011) (rejecting plaintiff's argument "that the court erred in admitting evidence of his prior arrests" because the plaintiff opened the door to this evidence by introducing evidence that sought to establish his "character for truthfulness and law-abiding citizenship"); *see generally* 21 Charles Alan Wright et al., *Federal Practice and Procedure* § 5039.1 (2d ed. 2012). A party can also open the door to rebuttal evidence through "statements made during his or her oral argument." *Reed v PST Vans, Inc.*, 156 F.3d 1231, No. 97-5079, 1998 WL 466573, at *3 n.3 (6th Cir. July 31, 1998) (unpublished opinion).

By seeking to establish his good character through testimony and argument, Helfrich opened the door to being cross-examined regarding his prior arrests. Helfrich's attorney extolled Helfrich's character during opening argument, remarking that Helfrich "was the star of the family." During his direct testimony, Helfrich continued to sound the theme of his exemplary character, adding that his image had been tarnished by the unjustified arrest. "I'm . . . a very strong individual, you know, and looked up to." Being "arrested in front of my entire family" was "completely humiliat[ing]" and "very embarrassing, especially when I wasn't doing anything wrong." In particular, "[w]hat was very most challenging is . . . having to explain what an arrest means to my niece and nephew and, you know, see Uncle Steve going to jail. You know, that's a tough thing to explain to kids." The point of Helfrich's suit in his own mind was "to clear my name with my family. There were 70 people at the wedding; all my . . . family. . . . I'm here to kind of reverse the injustice that I witnessed, you know, on how [the police] explained the story."

The opening argument, coupled with Helfrich's testimony, strongly implied that his arrest was so embarrassing and humiliating precisely because being arrested is inconsistent with the view his family had of him as their star and role model. The statements implied that Helfrich was not the sort to fight with police or get arrested. The district court had warned Helfrich and his attorney that they could open the door to rebuttal character evidence by implying that Helfrich "always had an exemplary record." The district court therefore did not abuse its discretion in concluding that Helfrich had opened the door to being cross-examined on whether he had been arrested previously.

**C.      Excluding evidence related to Helfrich's plea bargain**

The next issue is whether the district court committed reversible error by refusing to admit evidence related to Helfrich's guilty plea to disorderly conduct. Again, we review using the abuse-of-discretion standard and do not remand for a new trial when the error, if any, is harmless. *Nolan*, 589 F.3d at 264-65.

Helfrich argues that by refusing to admit this evidence, the district court erred in two ways: (1) it changed its position on the admissibility of the evidence, thus prejudicing Helfrich's case, and (2) it wrongly excluded admissible evidence. Under the first theory, Helfrich asserts that the district court ruled before trial that evidence regarding his guilty plea was admissible, thereby leading his attorney to tell the jury what Helfrich's criminal charges were and that they would learn how those charges were resolved (i.e., through the plea bargain Helfrich struck). Because the district court changed its position on the evidence's admissibility during Helfrich's case in chief, the jury did not learn about his plea bargain. Helfrich argues that this prejudiced his case by causing his attorney not to deliver on his implied promise to the jury.

But the premise of this argument is false: the district court consistently ruled that evidence regarding the plea bargain could be used to impeach if the other party opened the door to it. At the final pretrial conference, the court first ruled that it would allow evidence about what happened in the pool area and earlier in the evening because background facts such as whether Helfrich was drunk were relevant to what happened at the police car. But because the arrest's legality was not at issue, if Helfrich admitted evidence portraying himself as not being disorderly in the pool area, then that would open the door to Rodriguez impeaching Helfrich with his guilty plea to disorderly conduct. That impeachment would in turn open the door to Helfrich being able to explain why he pled. This analytical framework mirrors what the district court told the parties during trial. Helfrich incorrectly conflates the court's rulings regarding the evidence about what happened in the pool area (admissible within limits) with its rulings regarding the evidence about the plea (admissible only to impeach, and then only if the door is opened). Because the district court did not change its position regarding evidence of Helfrich's plea bargain, his first theory of error is unpersuasive.

Helfrich's second theory of error–that the district court wrongly excluded admissible evidence–has two components: (1) the dismissal of the assault charge is relevant because it makes Rodriguez's testimony that he was kicked by Helfrich—the very conduct forming the basis of the assault charge—less likely to be true,[4] and (2) Helfrich's explanation of why he pled guilty is relevant because the severity of the crime is a factor to consider in an excessive-force claim under *Graham*.

---

[4]Helfrich incorrectly asserts that his alcohol-intoxication and resisting-arrest charges were dismissed as well. But the alcohol intoxication and resisting arrest were merged into the disorderly conduct charge to which Helfrich pled guilty.

Regarding the first component, the district court reasoned that the evidence was irrelevant because this charge was dismissed as part of the give and take of a plea bargain, which means the charge could have been dismissed for any number of reasons. Rule 401 provides that to be relevant, evidence need only have *any* tendency to make a material fact more or less probable. While this evidence has a scintilla of probative value, that value is substantially outweighed by the danger of unfair prejudice. A jury lacks knowledge of how plea bargains work, how common they are, and what they typically mean for dismissed charges (answer: very little) and thus could easily place too much weight on the charge's dismissal. Accordingly, this evidence is inadmissible under Rule 403.

Helfrich's argument that he should have been able to explain why he pled is unpersuasive because why Helfrich pled is distinct from the critical issue in the case: was the force used by Rodriguez reasonable?[5] So this evidence is also inadmissible under Rule 403.

## D.  Hostility or bias of the judge

The next issue is whether the district court's questioning of Helfrich and Rodriguez showed hostility or bias. Whether the district court's conduct was hostile or biased is reviewed under an abuse-of-discretion standard. *McMillan v. Castro*, 405 F.3d 405, 409-10 (6th Cir. 2005). If the judge committed such misconduct, "reversal is automatic due to the structural nature of the error." *Id.* at 410. As a corollary, the harmless-error doctrine is also inapplicable. *Id.*

---

[5]Helfrich asserts that preventing him from explaining why he pled is especially problematic when coupled with the district court instructing the jury that his arrest was "lawful" because it created the impression that he was behaving badly and the cops were in the right. But the premise is false: the district court instructed the jury that the "lawfulness of the arrest is not in issue." And Helfrich expressly agreed to this instruction.

Rodriguez argues that the plain-error standard of review applies because Helfrich did not object to the judge's intervening below. But "[t]his court has implied . . . that the heightened plain-error standard might not apply to defaulted objections if raising a contemporaneous objection would have exacerbated the situation." *United States v. Hynes*, 467 F.3d 951, 958 (6th Cir. 2006). Helfrich argues in his reply brief that objecting to the judge's allegedly improper conduct "would have exacerbated the situation." We need not decide whether plain-error review applies in this case because Helfrich does not prevail under the lower abuse-of-discretion standard.

A district court's role in a trial extends beyond that of "a mere arbitrator" that rules on objections and instructs the jury; its role includes "conduct[ing] the trial in an orderly way with a view to eliciting the truth and attaining justice between the parties." *United States v. Hickman*, 592 F.2d 931, 933 (6th Cir.1979) (internal quotation marks omitted). This means ensuring that "issues are not obscured and that testimony is not misunderstood." *Id.* "The court may therefore interject itself into the proceedings"—including by questioning witnesses—to remove confusion in the evidence, *McMillan*, 405 F.3d at 410, or to "develop[] the facts," *United States v. Albers*, 93 F.3d 1469, 1486 (10th Cir. 1996) (internal quotation marks omitted). But the court must remain "impartial[] in demeanor as well as in actions." *Hickman*, 592 F.2d at 933. "Accordingly, the threshold inquiry is whether, with reference to a range of acceptable, though not necessarily model, judicial behavior, the district court's conduct falls demonstrably outside this range so as to constitute hostility or bias." *Hynes*, 467 F.3d at 958 (internal quotation marks omitted).

Helfrich points to three instances of the judge intervening during his or Rodriguez's testimony as showing hostility to or bias against Helfrich. The first instance involved the judge instructing Helfrich to answer the question without making speeches. Judges are authorized to

intervene if a witness is being difficult, and Helfrich was arguably posing a problem by answering the question and then continuing to offer discursive testimony that strayed from the question. *See Hickman*, 592 F.2d at 933 (reasoning that judges intervening to control a difficult witness is permissible). And the judge also admonished Rodriguez to tell him what is correct rather than merely replying, "Correct, Your Honor," to an open-ended question. That the judge was willing to intervene to correct both witnesses when they weren't replying to questions appropriately indicates that this intervention does not rise to the level of hostility or bias.

The second challenged instance of the judge's intervention involved Helfrich's testimony about what occurred immediately before the moment of the tase. Helfrich had testified about these facts in response to his attorney's examination just before the judge began questioning. The attorney's questions to Helfrich asked him what he *said*, not what he *did*. (In answering these questions, Helfrich testified that he responded to Rodriguez's order to "[g]et in the cruiser" by asking why he was being arrested.) But the judge asked Helfrich about what he said *and did* leading up to the tase. (In answering these questions, Helfrich testified that he did not comply with Rodriguez's instructions to get in the cruiser and he clarified other details of his testimony, such as the number of times Rodriguez told him to get into the cruiser before tasing him.) So Helfrich's testimony about the sequence of actions and statements leading to the tase changed slightly and became clearer in response to the judge's questioning. Having clear evidence regarding Helfrich's version of what he and Rodriguez said *and did* leading up to the tase is necessary because the legal inquiry under *Graham* requires the factfinder to consider whether the officer's actions are reasonable in light of the totality of the circumstances confronting the officer. *Graham*, 490 U.S. at 396-97. "It is the very function of the trial court to establish the facts as clearly and completely as possible." *United States*

*v. Campino*, 890 F.2d 588, 592 (2d Cir. 1989). To ensure that happens, a "federal trial judge should not hesitate to ask questions for the purpose of developing the facts; and it is no ground of complaint that the facts so developed may hurt or help one side or the other." *United States v. Albers*, 93 F.3d 1469, 1485-86 (10th Cir. 1996) (brackets and internal quotation marks omitted). Regarding this line of questioning, we therefore conclude that the judge did not abuse his discretion.

The third challenged instance of the judge's intervention involved Rodriguez's testimony about the same crucial sequence of events leading up to the tase. When questioning Rodriguez about these events, the judge told him to slow down and elaborate, remarking that "[t]his is the heart of the case" and "[t]his is the key to the case." Simply telling Rodriguez to testify slowly is not error because the issue of what happened just before the tasing is a critical issue under the *Graham* test, and asking a party to take his time aids in the clarity and completeness of the testimony. Commenting that this is the heart of the case during Rodriguez's testimony—but not during Helfrich's testimony on the same subject—is problematic for two reasons. First, the jury could infer that the judge credited Rodriguez's version more than Helfrich's. Second, the judge was telling the jury what was factually important. But it is the jury's function—not the judge's—to find the facts and determine which ones are important.

The problem described in the first reason is lessened because the jury could also reasonably infer that the judge simply meant that the interaction between the two parties just before tasing was the key to the case—no matter whose version they ended up believing. In other words, the jury could reasonably infer from the judge's comments something other than the problematic inference—namely, that the judge believed Rodriguez more than Helfrich.

There do not seem to be other interpretations which mitigate the second problem. The judge was telling the jury what was most factually important and potentially invading the province of the jury. However, the judge told them something that would be obvious from the governing legal test, on which the judge has the right and duty to instruct the jury. The legal inquiry under *Graham* requires the factfinder to consider whether the officer's actions are reasonable in light of the totality of the circumstances confronting the officer. *Graham*, 490 U.S. at 396-97. The facts leading up to the tase are obviously critical in answering this inquiry. So the judge's comment pointed out the importance of testimony that the jury would have concluded was important on its own.[6]

The best course would have been for the district court not to intervene in the questioning of either Helfrich or Rodriguez about the events immediately preceding the tase. When the court questioned Helfrich on this subject, he had yet to be cross-examined, so the clarity brought by the district court's questions may have been achieved through questions by Rodriguez's counsel. This would have been preferable to the court becoming involved in eliciting the crucial facts, especially when the court's varying comments during the two principal witnesses' testimony could be seen as endorsing Rodriguez's version and criticizing Helfrich's. The judge could have mitigated this problem by issuing standard instructions conveying the following information:

- that evidence includes only what the witnesses said while they were testifying under oath, the exhibits that the court allowed into evidence, the stipulations that the lawyers agreed to (if any), and the facts that the court has judicially noticed (if any);

---

[6]Indeed, one can reasonably infer from the judge asking Helfrich questions on the same subject of what happened just before the tase that Helfrich's testimony on this subject was also of critical importance. The difference is that the judge made explicit during Rodriguez's testimony what had been implicit during Helfrich's—namely, that testimony about events just before the tase was critical to deciding the case.

- that nothing else is evidence: the lawyers' statements and arguments, their questions and objections, are not evidence; the court's comments, statements, questions, and legal rulings are not evidence or facts;
- that nothing the court said or did during the trial was meant to influence the jury's decision in any way;
- that the jury should not interpret the court's statements or rulings on objections as indicating in any way how the court thinks the case should be decided.

*See* Sixth Circuit Criminal Pattern Jury Instructions 1.02, 1.04, 1.09, and 8.09 (available at http://ca6pub1.circ6.dcn/internet//crim_jury_insts.htm). The best practice would have been for the district court to convey the substance of this information, especially since it intervened in the trial by questioning the key witnesses about the key factual events.[7]

The comments during direct examination and the failure to issue a curative instruction present a troubling record. However, the governing standard is abuse of discretion. Because there are other reasonable interpretations of the district court's comments besides the problematic ones, and because abuse of discretion is a high standard, we conclude by a narrow margin that the district court did not abuse its discretion. In sum, though the judge's comments were problematic, this is not a case where "the conduct of the trial court [is] egregious, and fairly capable of characterization as beyond that necessary to fulfill the role of governor of the trial for the purpose" of "eliciting the truth and [of] attaining justice between the parties." *United States v. Tilton*, 714 F.2d 642, 645 (6th Cir.

---

[7]The district court did instruct the jury that "[n]othing I say *in these instructions* is to be taken as an indication that I have any opinion about the facts of the case, or what that opinion is." (Emphasis added.) By limiting this qualifier to what the district court said in the instructions, the district court failed to instruct the jury that its statements during the trial should similarly be disregarded by the jury. *See McMillan v. Castro*, 405 F.3d 405, 410, 412 (6th Cir. 2005) (reasoning that whether the district court issued a curative instruction is a factor to consider in determining if the court's questioning of a witness amounted to hostility or bias). And it was during the trial that the court made the problematic comments. Moreover, though the court did tell the jury to base its verdict on only the evidence, it did not define for the jury what evidence is.

1983) (internal quotation marks omitted) (first quotation); *Hickman*, 592 F.2d at 933 (internal quotation marks omitted) (second quotation).

**E.      Punitive damages**

The final issue is whether the district court erred in granting Rodriguez judgment as a matter of law on Helfrich's punitive-damages claim, thereby taking this issue away from the jury.  Because we conclude that the district court did not commit an error requiring us to set aside the jury's  finding that Rodriguez was not liable, any error by the court in refusing to instruct on punitive damages would be harmless.  *Toth v. Grand Trunk R.R.*, 306 F.3d 335, 355 (6th Cir. 2002) (holding that there was no need to consider Toth's objections to the district court's evidentiary rulings relating to damages because the jury found that the defendant was not liable).

**F.      Cumulative error**

In his reply brief, Helfrich argues that the cumulative effect of the district court's alleged evidentiary errors constitutes reversible error.  Helfrich raises this argument for the first time in his reply brief, and Rodriguez has not had an opportunity to respond. We have "consistently held that we will not consider such arguments." *American Trim, L.L.C. v. Oracle Corp.*, 383 F.3d 462, 477 (6th Cir. 2004).

### III.  CONCLUSION

For the above reasons, we **AFFIRM** the judgment of the district court.