RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 12a0413p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

DENNIS J. FREUDEMAN, individually and as executor for the estate of Deceased Dorothy V. Freudeman,

        *Plaintiff-Appellee*,

    *v.*

THE LANDING OF CANTON; EMERITUS CORPORATION, dba Emeritus Assisted Living, dba Emeritus Senior Living,

        *Defendants-Appellants*,

WEGMAN COMPANIES, INC.; WEGMAN FAMILY (CANTON) LLC VI,

        *Defendants*.

No. 12-3130

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 5:09-cv-175—David D. Dowd, Jr., District Judge.

Argued: December 5, 2012

Decided and Filed: December 19, 2012

Before: McKEAGUE and GRIFFIN, Circuit Judges; DLOTT, Chief District Judge.[*]

_____

## COUNSEL

**ARGUED:** Keith Hansbrough, BONEZZI SWITZER MURPHY, POLITO & HUPP CO., L.P.A., Cleveland, Ohio, for Appellants. Megan J. Frantz Oldham, TZANGAS, PLAKAS, MANNOS & RAIES, LTD., Canton, Ohio, for Appellee. **ON BRIEF:** Keith Hansbrough, Michelle B. Block, BONEZZI SWITZER MURPHY, POLITO & HUPP CO., L.P.A., Cleveland, Ohio, for Appellants. Megan J. Frantz Oldham, Lee E. Plakas, TZANGAS, PLAKAS, MANNOS & RAIES, LTD., Canton, Ohio, for Appellee.

_____

[*]The Honorable Susan J. Dlott, Chief United States District Judge for the Southern District of Ohio, sitting by designation.

---

OPINION

---

McKEAGUE, Circuit Judge.  Dorothy Freudeman ("Dorothy") was a resident at The Landing of Canton ("The Landing"), an assisted living facility.  She was discovered in an unresponsive state in her room and  spent fifteen months in a semi-comatose state before dying.  Her son, Dennis Freudeman ("Freudeman"), sued The Landing for negligence, violating Ohio's Patients' Bill of Rights, wrongful death, and punitive damages.  He alleged that staff at The Landing mistakenly gave Dorothy anti-diabetic medication, which caused hypoglycemia and resulted in permanent brain dysfunction.  Because he could not prove exactly how Dorothy received the medication, he requested a jury instruction on res ipsa loquitur, which the district court gave over The Landing's objection.  The jury found The Landing liable on all claims and awarded $680,000 in compensatory damages and $1,250,000 in punitive damages, plus attorney fees.

The Landing raises four issues on appeal.  First, it contends that the res ipsa loquitur instruction was improper.  Second, it argues that the district court engaged in judicial misconduct by exhibiting bias in favor of Freudeman during the proceedings.  Third, it claims that the district court should not have instructed the jury on punitive damages.  Fourth, it argues that the punitive damages award exceeded the statutory cap.  We affirm on the first three issues.  On the fourth issue, we reverse and remand with instructions to reduce the punitive damages award to $800,000.

## I.  BACKGROUND

Dorothy resided at The Landing from 2001 until 2007.  She was 80 years old in 2007.  She had Parkinson's disease, dementia, and had suffered a stroke in 2001.  However, she had no history of diabetes or hypoglycemia.  She was able to groom herself, use the restroom, walk with the aid of a walker, and feed herself.  On July 5, 2007, an employee of the facility discovered Dorothy at 11:20 a.m. in an unresponsive

state. She was taken to the hospital, and at 12:30 p.m. a lab test reported that her blood sugar level was 12. A normal blood sugar level ranges between 70 and 100. *Taber's Cyclopedic Medical Dictionary* 965 (Donald Venes et al. eds., 21st ed. 2009). A blood sugar level of 12 is extremely low and constitutes severe hypoglycemia. Dorothy was diagnosed with encephalopathy (brain dysfunction). Her condition improved slightly from her initially semi-comatose state, but her quality of life was severely diminished. She lived for fifteen months and died on October 23, 2008. She was survived by four adult children: Dana, Dennis, Deborah, and David.

Treating physicians suspected that a possible cause of Dorothy's hypoglycemia was ingesting anti-diabetic medication. Although a doctor ordered a test that would show the presence of such a drug, for an unknown reason the test was never performed. However, it is undisputed that Dorothy's medications were administered by staff at The Landing.

Shortly after Dorothy's death, Freudeman filed suit against The Landing and related corporate entities in the Stark County Court of Common Pleas. He alleged counts of negligence, violation of Ohio's Patients' Bill of Rights,[1] wrongful death, and punitive damages. The defendants removed the case to the United States District Court for the Northern District of Ohio.

The case was tried to a jury in late August 2011, and the trial lasted two weeks. The district court bifurcated the trial into liability and damages phases. Freudeman's attorneys proceeded upon the theory that staff at The Landing accidentally administered anti-diabetic medication to Dorothy, which caused her blood sugar to drop. They introduced the testimony of two physicians, Doctors Lenhard and Smucker, who testified that to a reasonable degree of medical probability Dorothy's hypoglycemia was caused by anti-diabetic medication. They also introduced the testimony of former employees of The Landing who described disturbing conditions at the facility, including

---

[1] Ohio Rev. Code Ann. § 3721.17(I)(1)(a) provides a cause of action for a resident of a nursing home whose rights under the statute have been violated. Freudeman alleged that The Landing violated Dorothy's "right to adequate and appropriate medical treatment and nursing care." *See* § 3721.13(A)(3).

disorganized medication carts, prepouring of medications, and falsification of medical records.  Although The Landing maintained medication error reports, the reports for 2007 were missing for an unknown reason.

In response, The Landing disputed that Dorothy was actually suffering from hypoglycemia on July 5, 2007.  It also introduced the testimony of two physicians, Doctors Myers and Evron, who testified that other things besides anti-diabetic medication could have caused Dorothy's hypoglycemia, including malnutrition, other medications, an undetected insulinoma,[2] and a urinary tract infection.  Because these physicians did not state in their expert reports that they had an opinion to a reasonable degree of medical probability, their testimony was limited to rebutting the testimony of Freudeman's expert witnesses.  They were not permitted to testify to an alternative cause for the injury.[3]

On the fifth day of the trial, The Landing moved for a mistrial on the ground of judicial misconduct, claiming that the district court had displayed bias against The Landing.  The district court denied the motion.

While instructing the jury during the liability phase of the trial, the district court gave a res ipsa loquitur instruction over The Landing's objection.  The issue of liability was submitted to the jury with a series of interrogatories.  The jury found The Landing liable for negligence and for violating Ohio's Patient's Bill of Rights.  After the jury's verdict, the district court conducted the damages phase of the trial.  The issue of damages was submitted to the jury, again with a series of interrogatories.  The jury awarded Dorothy's estate $400,000 for her economic damages and pain and suffering, and punitive damages of $1,250,000 plus attorney fees. It awarded each of her children

---

[2]An insulinoma is a tumor in the pancreas that manufactures excessive amounts of insulin.

[3]In Ohio, when testifying to proximate causation, an expert must testify that an event was the probable cause of the injury, that is, that it is more than fifty percent likely that the event caused the injury. *Stinson v. England*, 69 Ohio St. 3d 451, 455-56 (1994).  If the expert cannot testify with this degree of certainty, he or she can still rebut the other side's expert testimony by identifying other possible causes. *Fritch v. The Univ. of Toledo Coll. of Med.*, No. 11AP-103, 2011 WL 3925697, at *4 (Ohio Ct. App. Sept. 8, 2011).

$70,000 for wrongful death. The district court eventually awarded $494,037.50 in attorney fees and $60,136.67 in costs.

Subsequent to the jury's verdict, The Landing filed a motion for judgment as a matter of law and a motion for a new trial. Two grounds are relevant to this appeal: (1) the res ipsa loquitur instruction was improper, and (2) the instruction on punitive damages was improper and no reasonable juror could have found the malice necessary to award punitive damages. The district court denied the motions. The Landing also filed a motion to reduce the jury's verdict. It argued that because Ohio law caps punitive damages at twice compensatory damages, and punitive damages are not available in a wrongful death action, the punitive damages should not have exceeded twice the compensatory damages awarded to Dorothy's estate for the survival claims ($400,000), and should have been limited to $800,000. The district court summarily denied this motion.

## II. ANALYSIS

## A. Res Ipsa Loquitur Instruction

### 1. Standard of Review

We review a district court's decision to give a particular jury instruction for an abuse of discretion.[4] *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 536 (6th Cir. 2008). "This court will not reverse a decision on the basis of an erroneous jury instruction where the error is harmless." *Pivnick v. White, Getgey & Meyer Co., LPA*, 552 F.3d 479, 488 (6th Cir. 2009) (quotations omitted); *see also* Fed. R. Civ. P. 61. "A judgment may be reversed based upon an improper jury instruction only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *In re Scrap Metal Antitrust Litigation*, 527 F.3d at 536 (quotations omitted).

---

[4]Both parties state that the applicable standard of review is *de novo*. However, whereas the correctness of a statement of law in a jury instruction is a matter of law and reviewed *de novo*, the decision of whether to give a particular instruction is reviewed for an abuse of discretion. *See* 9C Federal Practice & Procedure § 2558 (3d ed. 2012). The Landing has not challenged the correctness of the res ipsa instruction. Rather, it has challenged the decision to give the instruction.

*2. Res Ipsa Loquitur*

**a. Legal Principles**

Generally speaking, to prove negligence a plaintiff must identify specific actions or omissions by the defendant and "must point to a particular way in which that conduct could have been made safer." Dan B. Dobbs et al., *Dobbs' Law of Torts* § 168 (2d ed. 2012). If the plaintiff cannot point to specific actions, he or she can sometimes invoke the doctrine of res ipsa loquitur. "Res ipsa loquitur is an evidentiary rule that permits, but does not require, a jury to draw an inference of negligence from circumstantial evidence." *Estate of Hall v. Akron Gen. Med. Ctr.*, 125 Ohio St. 3d 300, 303 (2010). "The rule allows a common sense appraisal of the circumstances surrounding an unusual accident, permitting a jury to draw the obvious conclusion that the accident was the defendant's fault and requiring the defendant to explain why the accident was not his fault." *Id.* "Res ipsa loquitur" literally means "the thing speaks for itself." *Id.* In *Byrne v. Boadle* (Ex. 1863), 159 Eng. Rep. R. 299; 2 H. & C. 722, a venerable English case that still provides the classic example for this doctrine, the plaintiff was hit on the head by a barrel of flour while passing by the defendant's shop. The plaintiff could not prove that the defendant was negligent because he did not know how or why the barrel fell. The Exchequer Court said that this was a case in which it could be said res ipsa loquitur—the thing speaks for itself. The accident itself gave rise to a presumption of negligence, so the burden to prove facts inconsistent with negligence rested upon the defendant.

In Ohio, res ipsa loquitur does not give rise to a presumption of negligence. It merely allows the jury to infer negligence. *See Morgan v. Children's Hosp.*, 18 Ohio St. 3d 185, 187 (1985). Furthermore, there are two prerequisites for applying the doctrine of res ipsa loquitur in Ohio. First, the instrumentality causing the plaintiff's injury must have been under the defendant's "exclusive management and control." *Estate of Hall*, 125 Ohio St. 3d at 305 (quotations omitted). Second, the injury must have "occurred under such circumstances that in the ordinary course of events it would not have occurred if ordinary care had been observed." *Id.* (quotations omitted).

"Where it has been shown by the evidence adduced that there are two equally efficient and probable causes of the injury, one of which is not attributable to the negligence of the defendant, the [doctrine] does not apply." *Jennings Buick, Inc. v. City of Cincinnati*, 63 Ohio St. 2d 167, 171 (1980).

### b. Application

The Landing presents three arguments as to why it was improper for the district court to instruct the jury on res ipsa loquitur in this case. However, before discussing these arguments, we must point out a false assumption that underlies two of them. At trial, Freudeman proceeded under the theory that anti-diabetic medication caused Dorothy's hypoglycemia. It called two experts who testified that such medication probably caused the injury. The Landing disputed this theory and called two experts who, although they could not testify to a *probable* cause of the injury, rebutted the testimony of Freudeman's experts by postulating that Dorothy's hypoglycemia could *possibly* have been caused by a variety of other factors.

The Landing assumes that this dispute is relevant to our evaluation of the res ipsa loquitur issue. However, The Landing has failed to appreciate that the interrogatories were arranged to eliminate any impact this dispute could have had upon the appropriateness of a res ipsa instruction. The first interrogatory asked whether Dorothy was hypoglycemic on July 5, 2007. The second interrogatory asked whether Dorothy's hypoglycemia was caused by anti-diabetic medication. The third interrogatory asked whether The Landing administered the anti-diabetic medication to Dorothy. Not until the fourth interrogatory was the jury asked whether The Landing was negligent. Each interrogatory required the jury to have answered "yes" to the previous interrogatory before moving to the next. Therefore, the jury was instructed not to reach the issue of negligence—where the res ipsa instruction became applicable—unless it first found that anti-diabetic medication caused Dorothy's injury. The Landing has not challenged the sufficiency of the evidence supporting the jury's finding that anti-diabetic medication caused Dorothy's hypoglycemia, so we view that finding as conclusive. Due to the arrangement of the interrogatories, in this case the res ipsa issue can be simplified to

asking whether res ipsa applies if anti-diabetic medication was the injury-causing instrumentality.

The above discussion demonstrates that The Landing's first argument is without merit. The Landing contends that res ipsa does not apply because the instrumentality that caused the injury was disputed. But this dispute was resolved against The Landing before res ipsa even came into play.

The Landing's second argument is that Freudeman did not establish the first prong for applying res ipsa loquitur—that the instrumentality causing the injury was within its exclusive management and control. It contends that res ipsa cannot apply because the instrumentality that caused Dorothy's injury—found by the jury to be anti-diabetic medication—was not within its exclusive management and control. Although the jury found pursuant to the third interrogatory that The Landing administered the anti-diabetic medication to Dorothy, The Landing asserts that Freudeman presented no direct evidence to that effect, which should preclude the application of res ipsa loquitur.

In support of this argument, The Landing cites a decision by the same district court judge that presided over the trial in this case: *Soehnlen v. Aultman Hosp.*, No. 5:06 CV 1594, 2008 WL 1886145 (N.D. Ohio, April 24, 2008). In that case the plaintiff claimed that she contracted Hepatitis C while undergoing a treatment that involved circulating her blood through a machine. *Id.* at *1. Her expert lacked expertise in the particular treatment she received and could identify no negligence, but he testified that the treatment was the most likely source of her infection. *Id.* at *3. The defendant's experts testified that all the components used in her treatment were sterile and that her blood was never exposed to an outside source. *Id.* at *4-6. Because she could not identify a specific act of negligence, the plaintiff invoked res ipsa loquitur. *Id.* at *9. The defendant moved for summary judgment, and the district court judge granted it. *Id.* at *12. He found that the instrumentality that caused the plaintiff's injury was body fluids infected with Hepatitis C, not the equipment and personnel used in her treatment. *Id.* at *9. He then concluded that obviously the hospital did not have exclusive management and control over every potential source of Hepatitis C. *Id.* at *9-10.

But the instrumentality in *Soehnlen*—bodily fluids containing Hepatitis C—is a far cry from the instrumentality in this case—anti-diabetic medication. Here, all of Dorothy's medications were administered by The Landing. Furthermore, testimony indicated that all the residents at The Landing who were taking non-insulin, anti-diabetic medication had their medications administered by The Landing. Indeed, only about four residents in the entire facility administered their own medications. And finally, The Landing of course exercised ultimate control over the assisted living facility.

To invoke res ipsa loquitur, the plaintiff need not rule out all far-fetched possibilities that a third party could have controlled the injury-causing instrumentality. In a case where a water main burst and damaged the plaintiff's building, the city argued that res ipsa loquitur did not apply because a third party could have caused the pipe to burst. *See Jennings Buick, Inc. v. City of Cincinnati*, 63 Ohio St. 2d 167, 172 (1980). The Ohio Supreme Court explained that "a showing of exclusive management and control is necessary only insofar as it supplies the logical basis for the inference that the negligence which caused the injury was that of the defendant, and not that of a third party." *Id.* at 173. Since the city owned the water mains and the ground surrounding them, it was "extremely unlikely" that a third party caused the pipe to burst. *Id.* Accordingly, the court found the exclusive management and control requirement to be met. *Id.*

Here too, since The Landing does not contest that it administered Dorothy's medications and in fact administered all the non-insulin, anti-diabetic medications in its facility, there is no evidence in the record that suggests that a third party provided the harmful medication to Dorothy. If The Landing did allow pills to sit out in its residents' rooms where they were accessible to other residents, or be carried in by visitors and distributed to its residents, this lax supervision itself would almost certainly constitute negligence. There is no evidence that Dorothy had a propensity to ingest illicit medications, so again the record does not support the contention that she obtained the medication herself. Instead, the facts establish a logical basis for inferring that if anyone

was negligent in this case, it was the personnel who administered Dorothy's medications. The Landing's second argument is without merit.

The Landing's third argument is that Freudeman did not establish the second prerequisite for applying res ipsa loquitur—that in the ordinary course of events the injury would not have occurred in the absence of negligence. It argues that since its experts testified to other possible causes for Dorothy's hypoglycemia that did not involve negligence, this is not a situation where negligence can be inferred. The Landing here repeats the same mistake it makes in its first argument—it ignores the fact that the jury was required to initially determine whether anti-diabetic medication caused Dorothy's injury. Once again, the issue must be approached with this preliminary finding in mind. The question is not whether a person can become hypoglycemic in the absence of negligence, but whether hypoglycemia caused by anti-diabetic medication would have occurred in this context in the absence of negligence. Correctly stating the issue makes the answer easy—no.

Finally, the policy underlying the doctrine of res ipsa loquitur supports its application here. The Ohio Supreme Court has explained that the doctrine "had its origin in the law of necessity." *Fink v. New York Cent. R. Co.*, 144 Ohio St. 1, 5 (1944). "The particular justice of the doctrine rests upon the foundation that the true cause of the occurrence whether innocent or culpable is within the knowledge or access of the defendant and not within the knowledge or access of the plaintiff." *Id.* The doctrine motivates the defendant to produce evidence that would deter the jury from inferring negligence. Here, the exact cause of Dorothy's injury was unascertainable by Freudeman. Dorothy sustained her injury while she was within the exclusive care of The Landing. The 2007 medication error reports, which were kept by The Landing and might have explained her injury, inexplicably went missing. Under these facts, requiring The Landing to provide an explanation to avoid a possible inference of negligence was perfectly appropriate and in furtherance of the justification behind the res ipsa doctrine. If nothing else, the instruction was not an abuse of discretion.

**B. Judicial Misconduct**

*1. Legal Principles*

"This Court reviews a district court's conduct during trial for an abuse of discretion." *McMillan v. Castro*, 405 F.3d 405, 409 (6th Cir. 2005). The trial judge, as the "governor of the trial," is free to ask questions to clarify a witness's testimony but must remain dispassionate and impartial. *Nationwide Mut. Fire Ins. Co. v. Ford Motor Co.*, 174 F.3d 801, 805 (6th Cir. 1999), *overruled on other grounds by Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009). A trial judge has considerable discretion to question witnesses in order to "clarify and develop [the] facts." *Ralph by Ralph v. Nagy*, 950 F.2d 326, 330 (6th Cir. 1991). However, it is reversible error for the trial court to belittle counsel, demonstrate outright bias, or "so infect[] [the trial] with the appearance of partiality" that the trial court's conduct inevitably improperly influenced the jury. *McMillan*, 405 F.3d at 409-10 (quotations omitted). The "threshold inquiry" is whether the district court's conduct falls outside the realm of acceptable, "though not necessarily model, judicial behavior." *Id.* at 410. In making this determination, we look at a variety of factors including "the nature of the issues at trial" (intervention is often needed in a long, complex trial), the conduct of counsel and witnesses, "the tone of the judicial interruptions, the extent to which they were directed at one side more than the other, and the presence of any curative instructions at the close of the proceedings." *Id.* If we find judicial misconduct, we will automatically reverse. *Id.* at 410.

*2. Application*

On day five of the trial, The Landing moved for a mistrial based on judicial misconduct, and the motion was denied. On appeal, The Landing points to three specific instances of alleged judicial misconduct. It claims that the district court essentially told the jury that it believed a witness had been impeached, implied that The Landing "burn[ed]" a medication error report, and inappropriately questioned a witness's credibility.

As to the claim that the district court told the jury that a witness, Bridgett Hall, had been impeached, the Landing pulls this statement out of context. The district court first discussed with the jury the concept of referring a witness to prior testimony and offered two potential reasons why lawyers do so: to refresh the witness's recollection or to impeach the witness's credibility. R. 281, Trial Tr. PageID # 3759. The district court stated, "I gather that counsel for the plaintiff is attempting to impeach this witness . . . because she's apparently testified to something differently today than . . . [in her] deposition." *Id.* The district court next stated, "It is for you to decide if she has been impeached . . . , and then it's also for you to decide whether it's of any importance." *Id.* The court never stated and hardly implied that the witness *was* impeached, and the court gave a prompt curative instruction.

Turning to the statement about burning a medication error report, context again is key. The district court asked the witness, Channin McElroy, where the medication reports were maintained, if she knew what happened to the missing reports, if she burned them, and if she left them for the person who took over her position. R. 283, Trial Tr. PageID # 4287-88. In response to the question, "Did you burn them?" the witness answered, "No I did not." *Id.* The use of the word "burn," which carries a prejudicial connotation in this context, is problematic. "Destroy" would perhaps have been more appropriate. However, when set in the context of a series of questions designed to clarify exactly what happened to a key missing document, the question does not indicate bias.

The final asserted basis for judicial misconduct is that the district court improperly questioned this same witness's veracity. McElroy had been the marketing director and then the executive director at The Landing of Canton. She testified very specifically to Dorothy's physical and mental well-being, including referring to a decline in appetite and unsteadiness in her gait. R. 283, Trial Tr. PageID # 4280-83. The district court interjected to ask, "There were 80-some residents there. How do you recall her specifically?" *Id.* at # 4283. She replied, "I had a very good relationship with the overall residents from the number of years that I was in that community." *Id.* The

district court responded, "You can tell me the same kind a [sic] picture about the other 79 residents?" *Id.* She answered, "Yes, Your Honor, I am [sic]," and the district court said, "Okay. Thank you." *Id.*

This series of questions did call into question the veracity of the witness's statements, but it was reasonable for the court to ask them because as a management-level employee, the witness was providing a surprising amount of detail about Dorothy's life. And after the witness explained how she knew these details, the district court thanked her for the explanation. Although the witness's credibility may momentarily have been called into question, the district court resolved a question that was likely present in the minds of the jurors, and if anything the conclusion of the exchange likely bolstered the witness's credibility.

Here, the conduct of the district court was not "egregious." *See United States v. Tilton*, 714 F.2d 642, 645 (6th Cir. 1983). This was a lengthy and complex trial that spanned a two-week period. At the close of the proceedings, the district court attempted to cure any possible indication of bias by stating, "[N]othing that I have said or done during the trial was meant to influence or should influence your decision about the facts in any way." R. 285, Trial Tr. PageID # 4896. In hindsight, the district court could perhaps have framed some of its questions differently, but such will often be the case after a long trial. As the trial was not "so infected with the appearance of partiality" that the district court's conduct inevitably improperly influenced the jury, *McMillan*, 405 F.3d at 410 (quotations omitted), we do not find judicial misconduct here.

## C. Punitive Damages Instruction

The Landing objected to the district court's instructing the jury on punitive damages and then raised this issue in its motion for judgment as a matter of law. We review a district court's decision to give a particular jury instruction for an abuse of discretion. *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 536 (6th Cir. 2008). We review the denial of a Rule 50(b) motion for judgment as a matter of law *de novo*. *Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 614 (6th Cir. 2007). "The motion may be granted only if in viewing the evidence in the light most favorable to the non-

moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party." *Id.* (quotations omitted). We do not "reweigh the evidence or assess the credibility of witnesses." *Id.*

Punitive damages are designed to punish and deter, not to compensate. *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St. 3d 638, 651 (1994). Under Ohio law, in order to recover punitive damages for a negligence claim or a claim under the Patient's Bill of Rights, the plaintiff must establish, by clear and convincing evidence, that "the actions or omissions of [the] defendant demonstrate malice or aggravated or egregious fraud." Ohio Rev. Code Ann. §§ 2315.21(C)(1), 2315.21(D)(4), 3721.17(I)(2)(b). Malice is divided into two categories: "(1) that state of mind under which a person's conduct is characterized by hatred, ill will, or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 32 Ohio St. 3d 334, 336 (1987). Here the second category is at issue.

The "conscious disregard" type of malice "requires the party to possess knowledge of the harm that might be caused by his behavior." *Malone v. Courtyard by Marriott L.P.*, 74 Ohio St. 3d 440, 446 (1996). Because "it is rarely possible to prove actual malice otherwise than by conduct and surrounding circumstances," "actual malice can be inferred from conduct and surrounding circumstances which may be characterized as reckless, wanton, willful or gross." *Villella v. Waikem Motors, Inc.*, 45 Ohio St. 3d 36, 37 (1989) (quotations omitted).

In this case, the district court found "that the record was replete with evidence from which a reasonable jury could find for [the] plaintiff on punitive damages." R. 329, Memorandum Opinion, PageID # 5640. Specifically, the record reflects that multiple medication errors occurred prior to the one at issue. Because only 2 LPNs were responsible to care for 80 residents, the nurses were very rushed. As a result of their haste, the nurses regularly engaged in the unsafe practice of pre-pouring residents' medications. The medication cart was "a mess" most of the time. The wrong pills were found in the medication trays. The nurses would borrow medication from one resident

and give it to another. At the time of her death, over fifty of Dorothy's pills were missing. Furthermore, testimony indicated that medical records were routinely falsified or doctored. On one described occasion, a supervisor altered the records to cover up a medication error. Staff, including the supervisor, would routinely retroactively fill in "holes" in the residents' medication administration records at the end of the month. Punitive damages are appropriate to punish and deter such conduct. *See Moskovitz*, 69 Ohio St. 3d at 653 (finding actual malice when a doctor intentionally falsified medical records to avoid liability).

While The Landing contends that Freudeman could show only simple negligence, Freudeman presented sufficient evidence to demonstrate that The Landing consciously disregarded the rights and safety of its patients with a great probability of causing substantial harm. The conduct and surrounding circumstances testified to at trial demonstrate a chaotic environment characterized by hastiness, shortcuts, and casual coverups. Reasonable minds could find malice based on the evidence presented. We hold that instructing the jury on punitive damages was not an abuse of discretion and affirm the district court's denial of The Landing's motion for judgment as a matter of law.

**D. Punitive Damages Award**

In Ohio, punitive damages in certain tort actions are subject to a statutory cap of two times the compensatory damages awarded to the plaintiff. Ohio Rev. Code Ann. § 2315.21(D)(2)(a). The pertinent statutory provision reads as follows:

> (D)(1) In a tort action, the trier of fact shall determine the liability of any defendant for punitive or exemplary damages and the amount of those damages.
>
> (2) Except as provided in division (D)(6) of this section, all of the following apply regarding any award of punitive or exemplary damages in a tort action:
>
> > (a) The court shall not enter judgment for punitive or exemplary damages in excess of two times the amount of the compensatory damages awarded to the plaintiff from that defendant.

§ 2315.21. If a jury is responsible for determining the amount of punitive damages, the jury is not informed of the statutory cap. § 2315.21(F).

In this case, Freudeman brought survival claims (for negligence and violation of the Patients' Bill of Rights) for the injuries suffered by Dorothy prior to her death and a separate wrongful death claim for the injuries suffered by her children. The jury awarded $400,000 for the survival claims and $280,000 for the wrongful death claim ($70,000 to each child). The jury also awarded $1,250,000 in punitive damages for the survival claims.

The Landing contends that for purposes of determining the statutory cap on punitive damages, the district court should have considered only the damages awarded to Dorothy's estate and not the wrongful death damages awarded to her children. According to this approach, the statutory cap would have been $800,000 (2 x $400,000). The district court, without discussion, found that this argument was "without merit." Since $1,250,000 was less than twice the total amount of compensatory damages awarded in the lawsuit, the district court did not reduce the punitive damages award.

Put simply, the question here is whether the compensatory damages awarded for the wrongful death claim can be considered when determining the statutory cap on the punitive damages awarded for the survival claims. The answer is no, but to see why, it is necessary to understand the separate claims brought in this lawsuit. Since this issue presents a question of law, we approach it *de novo*. *See Cutter v. Wilkinson*, 423 F.3d 579, 584 (6th Cir. 2005).

When a person is killed by the tortious conduct of another, two main causes of action arise from the incident. *See Thompson v. Wing*, 70 Ohio St. 3d 176, 179 (1994). First, the common-law tort action for the decedent's own injuries suffered before death survives and can be brought by the executor or administrator of the decedent's estate.[5]

---

[5] The terminology used to describe this cause of action varies. It has been referred to by the Ohio Supreme Court as a "survival" action, a "survivorship" action, and a "survivor" action. *See Peters v. Columbus Steel Castings Co.*, 115 Ohio St. 3d 134, 137 (2007); *Hiatt v. S. Health Facilities, Inc.*, 68 Ohio St. 3d 236, 236 (1994); *Fielder v. Ohio Edison Co.*, 158 Ohio St. 375, 378 (1952), *superseded by statute on other grounds*. Most recently, the court used "survival" action, *see Peters*, 115 Ohio St. 3d at 137, so

Ohio Rev. Code Ann. § 2305.21; *Sinaver v. Szymanski*, 14 Ohio St. 3d 51, 55 (1984). For a survival claim, the decedent's estate can recover both compensatory and punitive damages. *See Estate of Beavers v. Knapp*, 175 Ohio App. 3d 758, 768 (2008). When bringing a survival claim, the executor or administrator "acts in his official capacity for the benefit of the decedent's estate." *Fielder v. Ohio Edison Co.*, 158 Ohio St. 375, 378 (1952), *superseded by statute on other grounds*.

The second available cause of action is for wrongful death. The decedent's beneficiaries (as defined by statute) have a statutory cause of action for wrongful death. Ohio Rev. Code Ann. § 2125.01. A wrongful death claim must be "brought in the name of the personal representative of the decedent." § 2125.02(A)(1). The personal representative "is not the real party in interest but acts merely as a nominal or formal party or statutory trustee for the statutory beneficiaries who are the real parties." *Kyes v. Penn. R. Co.*, 158 Ohio St. 362, 364 (1952). To qualify as a personal representative, an individual must be court-appointed as the executor or administrator of the decedent's estate or as the decedent's personal representative. *Ramsey v. Neiman*, 69 Ohio St. 3d 508, 512 (1994).

Although often the executor of the decedent's estate and the decedent's personal representative are the same person, the Ohio Supreme Court has specified that wrongful death proceeds are received by this person in his or her capacity as the personal representative of the decedent, and not in his or her capacity as the executor of the decedent's estate. *Holt v. Grange Mut. Cas. Co.*, 79 Ohio St. 3d 401, 407 (1997); *see also Fielder*, 158 Ohio St. at 379 ("The administrator or executor is a mere nominal party to the action, having no interest in the case for himself or the estate he represents."). For a wrongful death claim, the beneficiaries can recover "compensatory damages," which include damages for loss of support, loss of services, loss of society, loss of prospective inheritance, and the beneficiaries' mental anguish. § 2125.02(B). Punitive damages are not available for a wrongful death claim. *See id.*; *Estate of*

_____

that is how we will refer to it.

*Beavers*, 175 Ohio App. 3d at 768 (quoting *Rubeck v. Huffman*, 54 Ohio St. 2d 20, 23 (1978)).

Although a survival claim and a wrongful death claim are typically pursued by the same nominal party and must usually be joined in the same action,[6] the Ohio Supreme Court has emphasized that they are separate and independent causes of action. *See Peters v. Columbus Steel Castings Co.*, 115 Ohio St. 3d 134, 138 (2007). "[I]t is clear that survival claims and wrongful-death claims are distinct claims that belong to separate individuals, even though they are generally brought by the same nominal party (the personal representative of the estate)." *Id.* "[T]here is no mistaking the independent nature of these actions." *Id.*

With these background principles in mind, the correct resolution of the issue at hand becomes more clear. Once again, the question here is whether the compensatory damages awarded for the wrongful death claim can be combined with the compensatory damages awarded for the survival claims when determining the statutory cap on the punitive damages awarded for the survival claims. Apparently no Ohio appellate court has addressed this issue. However, we do not think the issue is a particularly hard one. Freudeman was the nominal party who prosecuted all the claims in this case. However, for the survival claims he sued as executor on behalf of Dorothy's estate, and for the wrongful death claim he sued as Dorothy's personal representative for the benefit of her beneficiaries. He received the compensatory damages for the survival claims in his capacity as the executor of Dorothy's estate, and he received the compensatory damages for the wrongful death claim in his capacity as Dorothy's personal representative.

For the survival claims and the wrongful death claim, both the capacity in which Freudeman sued and the real parties in interest on whose behalf he sued were different. The punitive damages statute instructs the trial court to look at "the amount of the

---

[6]Ohio's compulsory joinder rule mandates that a survival claim and a wrongful death claim be joined in the same action, unless a party or the person to be joined can show good cause why they should not. Ohio Civ. R. 19.1(a)(1).

compensatory damages awarded to the *plaintiff*."[7]    Ohio Rev. Code Ann. § 2315.21(D)(2)(a).  The real plaintiff for the survival claims was Dorothy's estate, and only the compensatory damages awarded to that plaintiff should have been considered by the district court.  In addition to being contrary to the language of the statute, considering the wrongful death damages so as to expand the statutory cap on punitive damages would also violate the established principle that punitive damages are not available for a wrongful death claim.

Due to the separate claims and the distinct capacities in which Freudeman pursued them, it was improper for the district court to combine all the compensatory damages awarded for all the claims in the lawsuit.  Instead, to determine the statutory cap on punitive damages awarded to Dorothy's estate for its survival claims, the district court should have considered only the compensatory damages awarded to that plaintiff for those claims.  Since the jury awarded $400,000 in compensatory damages for the survival claims, the maximum amount of punitive damages permitted by the statutory cap is $800,000.

### III.  CONCLUSION

As explained above, we **AFFIRM** on the res ipsa loquitur, judicial misconduct, and punitive-damages instruction issues.  On the punitive-damages-cap issue, we **REVERSE** and **REMAND** with an instruction to reduce the punitive damages award to $800,000.

---

[7]At oral argument, Freudeman's attorney quoted the statute to say "the amount of compensatory damages awarded to the *plaintiffs*."  Although most likely the misquote was inadvertent, we believe the singular form of the word is significant and indicates that when calculating the statutory cap it would be inappropriate to simply amalgamate all compensatory damages awarded for all claims brought by all plaintiffs, which is essentially what Freudeman is urging us to do.