RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0056p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

LAWRENCE MARK SHERMAN, M.D.,

*Defendant-Appellant*.

Nos. 24-1470/25-1080

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Ann Arbor.
No. 5:21-cr-20393-3—Judith E. Levy, District Judge.

Decided and Filed:  February 27, 2026

Before:  GIBBONS, LARSEN, and MURPHY, Circuit Judges.

─────────────────

## COUNSEL

**ON BRIEF:** Ronald W. Chapman II, CHAPMAN LAW GROUP, Detroit, Michigan, for Appellant.  Andrew J. Lievense, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

─────────────────

## OPINION

─────────────────

LARSEN, Circuit Judge.  Dr. Lawrence Sherman was convicted at trial of one count of conspiring to possess with intent to distribute and to distribute controlled substances and nineteen counts of unlawful distribution of controlled substances.  He now appeals the judgment and the district court's denial of his motion for new trial.  Seeing no reversible error, we AFFIRM.

I.

In April 2020, an illegal prescription pill dealer, Angelo Smith, and his girlfriend, Janeice Burrell, opened Tranquility Wellness Center in Southeastern Michigan. They hired Dr. Lawrence Sherman to work one day per week at Tranquility. New patients could walk in without an appointment and Tranquility did not bill health insurance. The patients paid in cash and typically walked out with an opioid prescription from Sherman. If a patient reported pain but did not have an MRI report on file, Sherman typically wrote a prescription for Percocet. To write any stronger a prescription, he expected an MRI report. Conveniently, one of Smith and Burrell's employees, Akeyla Bell, offered fake medical records for an extra charge. And, though they never told Sherman about this aspect of the business, Sherman noticed that some "didn't quite look right." *E.g.*, R. 219, Excerpt of Proceedings, PageID 1420–21. On one occasion, Bell gave a patient an MRI report Sherman had seen before. Sherman told the patient to "fix it." *Id.* Smith and Bell gave the patient a new fake MRI. The patient saw Sherman again that day and went home with an opioid prescription. On another occasion, Sherman mentioned that he suspected some patients were faking their pain, but he prescribed opioids nonetheless.

Patients were charged a cash fee for their initial visit so long as they received a high-strength drug. Patients who did not receive a prescription or who received a low-strength prescription were not charged. The clinic paid Sherman $100 for each initial visit in which the patient was charged and paid him $25 for each time a patient returned and received a prescription refill. Sherman typically did not interact with patients on their return visits, however; he instead refilled their prescriptions electronically—sometimes from the office, sometimes from home, and sometimes from vacations in Florida and Mexico. Altogether, Sherman wrote more than 4,100 prescriptions for more than 310,000 doses of Schedule II controlled substances while at Tranquility.

Tranquility eventually attracted scrutiny. After a lengthy investigation, Sherman was indicted on one count of conspiracy to possess with intent to distribute and to distribute controlled substances and nineteen counts of unlawful distribution of controlled substances. Tranquility's owners and the rest of the staff were also indicted. They pleaded guilty; Sherman went to trial, where his alleged co-conspirators testified against him. After hearing from Smith,

Burrell, Bell, other Tranquility associates, a government expert, more than one FBI agent, and an IRS agent, the jury convicted Sherman on all counts.  The district court sentenced Sherman to 144 months' incarceration.  Sherman now appeals the judgment and the district court's denial of his motion for new trial.

## II.

Sherman first challenges the sufficiency of the evidence for his convictions and the district court's issuance of a deliberate ignorance instruction.

## A.

We review "de novo the sufficiency of the evidence to sustain a conviction," asking "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Emmons*, 8 F.4th 454, 477–78 (6th Cir. 2021) (citation modified).

"Like most other claims, this one must be preserved below" by moving for a judgment of acquittal.  Lissa Griffin, *Federal Criminal Appeals* § 4.30 (rev. July 2025) (discussing Fed. R. Crim. P. 29); *accord* 2A *Wright & Miller's Federal Practice & Procedure* § 469 (4th ed. 2025) (same, though noting that a distinct rule applies to criminal bench trials).  Rule 29 permits a defendant to so move either after "the government closes its evidence or after the close of all the evidence."  Fed. R. Crim. P. 29(a).  The court may "reserve decision on the motion" but "must decide the motion on the basis of the evidence at the time the [motion was made]."  *Id.* at 29(b).  Sherman moved for a judgment of acquittal at the close of the government's case-in-chief.  He asked that "if the Court does reserve," he be given "the ability to provide a written motion to the Court for its benefit after the close of evidence."  R. 276, Trial Tr., PageID 5389.  The court agreed that it would afford him this opportunity.  After hearing oral argument on the motion, the district court initially indicated that it would "deny [the motion] at this time," but quickly switched course to "take it under advisement until the close of the case."  *Id.* at 5410.  Nonetheless, the district court chose to "give [counsel] a foreshadowing of [its] perspective on this, which [was] that [the court] [did] not believe [Sherman had] met the requirements for succeeding on a Rule 29" motion, but the court said it would "take it under advisement."  *Id.*;

*see also* R. 229, Bench Order.  At the close of Sherman's case-in-chief, counsel did not renew the motion.  Nor does it appear from the docket below that counsel ever provided the written motion discussed.  Twenty days after the jury returned a verdict, the court issued a two-page written opinion denying the reserved motion for a judgment of acquittal.

The government argues that by failing to renew his motion at the close of evidence, Sherman waived his motion.  The traditional rule is that "when the defendant moves for judgment of acquittal at the close of the government's case-in-chief, and defense evidence is thereafter presented but the defendant fails to renew the motion at the close of all of the evidence, he waives objection to the denial of his earlier motion."  *United States v. Price*, 134 F.3d 340, 350 (6th Cir. 1998); *see also 2A Wright & Miller* §§ 463, 469; Griffin, *supra*, § 4.30.  In those circumstances, "appellate review is limited to determining whether there was a 'manifest miscarriage of justice.'"  *Price*, 134 F.3d at 350 (citation omitted).

But some courts have questioned whether this rule applies when a court does not immediately deny but rather reserves ruling on a motion made mid-trial, only to deny the motion later.  *See* 2A *Wright & Miller* § 463.  In *United States v. Wagner*, we noted the D.C. Circuit's view that, in this situation, "the defendant does not waive his or her objection to the ultimate denial . . . by failing to renew the motion at the close of all the evidence" and "is not required to take any additional procedural steps to preserve the issue for appellate review."  382 F.3d 598, 611 n.2 (6th Cir. 2004) (citing *United States v. Wahl*, 290 F.3d 370, 374 (D.C. Cir. 2002)).  But *Wagner* did not decide the question because, in that case, the district court never ruled on the reserved motion.  *Id.*  We need not decide that question here either.  Because Sherman's arguments fail even under the usual rational-trier-of-fact analysis, we apply that standard here.

The crux of Sherman's argument on appeal is that the government's objective evidence cannot prove that he had actual, subjective knowledge that his prescriptions were unauthorized under the Controlled Substances Act or that he knowingly entered into a conspiracy to distribute those drugs.  Start with the first of those issues.  True: the Supreme Court's recent decision in *Ruan v. United States* makes plain that the government "must prove beyond a reasonable doubt that the defendant knowingly or intentionally acted in an unauthorized manner," a subjective inquiry.  597 U.S. 450, 468 (2022).  But it is black letter law that there need not be

"direct evidence of the defendant's mental state, such as by testimony of the defendant at trial." 1 Jens David Ohlin, *Wharton's Criminal Law* § 5:1 (16th ed. 2025). And *Ruan* confirmed that the government "of course, can prove knowledge of a lack of authorization through circumstantial evidence." 597 U.S. at 467. It may do this by putting on evidence showing just how "unreasonable a defendant's asserted beliefs" are, "as measured against [the] objective criteria" of the Controlled Substances Act—such as a reasonable doctor's "legitimate medical purpose and usual course of professional practice." *Id.* (citation modified). Accordingly, a defendant's "fail[ure] to adequately examine [his] patients, establish diagnoses, consider red flags, or attempt more conservative treatment options," "in violation of the standard of care espoused by the Government's [medical practice] expert," permits a jury to infer the defendant's subjective knowledge and intent to issue unauthorized prescriptions. *United States v. Bauer*, 82 F.4th 522, 529 (6th Cir. 2023).

Sherman does not meaningfully dispute the presence of such objective evidence. The jury heard expert testimony that Sherman's conduct in examining patients, prescribing narcotics, and issuing refills deviated from usual, legitimate medical practice. Jurors saw the transparently fake MRI reports Sherman's alleged co-conspirators provided him to substantiate his diagnoses. They observed his consistent choice to prescribe the drugs most popular on the street at the highest available strength. Jurors heard that Sherman never checked the results of the urine screens he ordered to see if patients were abusing other drugs. And the jury knew that Sherman agreed to work in a clinic that would pay him for patient work only if he prescribed a sufficiently strong narcotic. This evidence, viewed in the light most favorable to the government, allowed the jury to conclude that Sherman knew that his prescriptions were not authorized. And because Sherman disputes only that he knew of and shared the criminal intent of his putative co-conspirators, this same evidence suggesting that Sherman knowingly issued unauthorized prescriptions permits a jury to infer that he voluntarily and knowingly joined the conspiracy to do so.

B.

Sherman next argues that the district court erred in issuing a deliberate ignorance instruction to the jury. We review for an abuse of discretion and will reverse only if

"the instructions as a whole prove confusing, misleading, or prejudicial." *United States v. Stanton*, 103 F.4th 1204, 1212 (6th Cir. 2024); *accord United States v. Geisen*, 612 F.3d 471, 485 (6th Cir. 2010). The district court informed the jury that:

> No one can avoid responsibility for a crime by deliberately ignoring the obvious.
>
> If you are convinced that the defendant deliberately ignored a high probability that he was issuing unauthorized prescriptions, that is prescriptions that were not issued for a legitimate medical purpose in the usual course of professional practice by a licensed doctor, then you may find that he knew about it.
>
> But to find this, you must be convinced beyond a reasonable doubt that the defendant was aware of a high probability that he was issuing unauthorized prescriptions. That is prescriptions that were not issued for a legitimate medical purpose in the usual course of professional practice by a licensed doctor and that the defendant deliberately closed his eyes to what was obvious.
>
> Carelessness or negligence or foolishness on his part is not the same as knowledge and it is not enough to convict. This, of course, is all for you to decide.

R. 273, Trial Tr., PageID 4560.

These instructions are functionally identical to language we endorsed three years ago in *United States v. Anderson*, 67 F.4th 755, 766 (6th Cir. 2023) (per curiam), *cert. denied*, 144 S. Ct. 552 (2024), and Sherman does not contend otherwise. So the only question here is whether it was proper to give a deliberate ignorance instruction on the facts of this case.

A trial court may instruct a jury on deliberate ignorance if "(1) the defendant claims a lack of guilty knowledge; and (2) the facts and evidence support an inference of deliberate ignorance." *United States v. Mitchell*, 681 F.3d 867, 876 (6th Cir. 2012). Sherman focuses on the second of these prongs, arguing that "the court never identified any particular fact that [he] was alleged to have deliberately ignored" and failed to link the instruction "to any specific evidence of willful blindness." Appellant Br. at 28.

Sherman's argument lacks merit. The evidence adequately supports the inference that Sherman deliberately ignored the fact that there was no legitimate medical purpose for the prescriptions he wrote. In its opinion denying the motion for new trial, the district court identified Sherman's agreement to work for a clinic that did not bill insurance and to be paid, in

cash, only for those patient visits that produced a prescription for a strong opioid.  It identified Sherman's failure to review the results of his patients' drug screenings.  It identified Sherman's failure to communicate with patients after an initial visit by phone, email, or messaging platform before renewing their prescriptions.  It identified Sherman's decision to prescribe narcotics despite questioning the authenticity and existence of patients' MRI reports, despite failing to ensure that patients attended physical therapy, and despite remarking that he thought some patients "were faking it in terms of their physical exam."  R. 339, Op. & Order, PageID 6219 (quoting R. 218, Trial Tr., PageID 1242).  As before, this evidence permits the inference that Sherman issued prescriptions with actual knowledge that those prescriptions were unauthorized. And, alternatively, the evidence permits the inference that Sherman merely looked the other way, "deliberately ignor[ing] a high probability that he was issuing unauthorized prescriptions," "deliberately clos[ing] his eyes to what was obvious."  R. 273, Trial Tr., PageID 4560 (jury instructions).  The district court did not err by giving the instruction.

III.

Sherman next argues that the district court erred in refusing to admit pages of his patient notebooks during his cross-examination of Angelo Smith and FBI Case Agent Koczenasz.  The district court refused to admit the evidence because it found that the witnesses could not properly authenticate the documents, the documents were irrelevant, and the documents were hearsay that fell under no exception to the rule prohibiting it.  *See* R. 339, Op. & Order, PageID 6164–6180. Any one of these rationales is sufficient to justify the exclusion.  "We review a district court's exclusion of evidence for an abuse of discretion."  *United States v. Thompson*, 119 F.4th 445, 449 (6th Cir. 2024) (per curiam).

Sherman has not proffered the content of these documents in any detail.  In his brief on appeal, he represents that the "notebooks included handwritten notes not found in the EMRs [(electronic medical records)]" that would demonstrate that "he did take patient histories and properly assessed medical conditions before prescribing controlled substances."  Appellant Br. at 37.  This is in some tension with his description of the contents at trial.  There, he claimed that "these notebooks match up with the EMR" ("the principal purpose for offering the notebooks"); and the notebooks were trustworthy because "you can compare [the notebooks] with the

electronic medical record" and find that "the information is the same."  R. 276, Trial Tr., PageID 5331, 5334.  To be sure, when the district court explained that it understood the notebooks to be duplicative of the EMRs, defense counsel offered that "it is important . . . to compare what Dr. Sherman wrote contemporaneously with what is specifically in the EMR"—suggesting that some differences were present.  *Id.* at 5336.  But defense counsel also described Sherman as "cop[ying]" whatever information was in the notebooks "to a chart later."  *Id.*  In any event, as the district court noted, neither Sherman's arguments at trial nor his Motion for New Trial "identif[ied] any 'additional information' in the notebooks that was not recorded in the electronic medical record," much less did they explain why such information was relevant.  R. 339, Op. & Order, PageID 6175.  And his appellate briefing does no better.  To this day, we do not know what information he claims was in the notebooks but was not in the EMR.

"A ruling excluding evidence may be appealed by right only where there was a proper offer of proof" providing "[t]he substance of the excluded evidence."  21 *Wright & Miller* § 5041 (citation modified); *see also Polack v. Comm'r*, 366 F.3d 608, 612 (8th Cir. 2004) (holding that "a party must express precisely the substance of the excluded evidence" (citation modified)).  After all, an "appellate court cannot properly review the alleged error unless it knows exactly what evidence was excluded."  21 *Wright & Miller* § 5042.  It does not suffice to give "the general subject matter of the evidence," *United States* ex rel. *Veal v. DeRobertis*, 693 F.2d 642, 648 (7th Cir. 1982), say, by indicating that a witness "would testify as to [h]is version of the conversations that he had with" other witnesses, *United States v. Winkle*, 587 F.2d 705, 710 (5th Cir. 1979).  Here, Sherman's offer must be adequate to allow this court to determine whether the specific evidence being offered was relevant, not duplicative, and whether its exclusion was harmless.

Sherman's offer does not meet that bar.  Neither the transcript of the trial nor the record (or even the briefing) on appeal provides any specificity as to the contents of the pages he sought to introduce.  *See* 6th Cir. R. 10(b); *cf. Hicks v. Floyd Cnty. Bd. of Educ.*, 99 F. App'x 603, 605–06 (6th Cir. 2004) (finding no error where a party "neglected to include in the record copies of the disputed exhibits, with one exception, or even to identify them").  Consequently, we are unable to determine whether the notebooks made any material fact—for instance, whether

Dr. Berland was correct that Sherman took inadequate patient histories—more or less likely.  It follows that Sherman has not preserved his relevance objection for our review.  Nor, if we were to assign error to the exclusion, has he given us information sufficient to determine whether the error was harmful.  Accordingly, we cannot say that the district court abused its discretion in failing to admit the notebook pages into evidence.

IV.

Sherman argues that the district court erred in failing to admit exculpatory portions of a recorded phone conversation.  He invokes the rule of completeness because the government had already played other portions of the recording for the jury.  *See* Fed. R. Evid. 106.

Whenever one party introduces "all or part of a statement" at trial, Rule 106 allows an adversary to contemporaneously introduce "any other part—or any other statement—that in fairness ought to be considered at the same time."  *Id.*  We have read the rule's "fairness" language to describe the need "to correct a misleading impression created by the introduction of part of a writing or conversation" by placing "the admitted portions in proper context."  *United States v. Holden*, 557 F.3d 698, 705 (6th Cir. 2009).  The rule was amended on December 1, 2023, to permit an adverse party to introduce the completing testimony "over a hearsay objection."  Fed. R. Evid. 106.[1]  This amendment abrogates the rule of *United States v. Costner*, 684 F.2d 370 (6th Cir. 1982), under which "exculpatory hearsay [could] not come in solely on the basis of completeness," *United States v. Adams*, 722 F.3d 788, 826 (6th Cir. 2013) (citation modified).

The government claims that plain error review applies because Sherman never offered the rule of completeness as a basis for admission, either when the government admitted the partial recordings as exhibits or when Sherman later sought to play the relevant portions on the re-cross of Smith.  We also do not see in the transcript where Sherman invoked Rule 106.  And Sherman's reply brief does not respond to this point.  Accordingly, we conclude that Sherman failed to make a timely objection on Rule 106 grounds and we accept the government's

---

[1]The parties agree that the amended rule governed the disputed testimony in this case.  *See* R. 339, Op. & Order, PageID 6203 n.12.

invitation to review for plain error. *See* Fed. R. Evid. 103(a), (e). *But see* 21 *Wright & Miller* § 5083 (suggesting that error will never be present when Rule 106 is not contemporaneously invoked). Sherman seeks to admit portions of a recording in which Smith frets to a confidential informant about a time that Smith caught an obviously-fake MRI report Bell had produced. Smith remarks: "Imagine if it w[ere] the doctor that caught [the false MRI]." *See* Appellant Br. at 9, 40; R. 276, Trial Tr., PageID 5241–42, 5268. Either Smith or the informant continued that "he would be ready to get the f[***] on."[2] Appellant Br. at 40. Sherman interprets this statement to suggest that he did not know that the MRI reports were doctored and that he would have left the practice if he did. When Sherman sought to play the recording at trial, he described it both as useful for impeachment purposes and as substantive evidence, admissible as nonhearsay because it was not being used to prove the truth of the matter asserted.

The trial court eventually allowed Sherman to play the relevant portion of the recording to impeach Smith's testimony. Sherman contends, however, that it was error not to admit the recording as substantive evidence. We need not decide this question, however, because even if the recording were plainly misleading as presented by the government, Smith has not overcome the third prong of plain error review by showing an effect on his substantial rights. *See United States v. Olano*, 507 U.S. 725, 731–35 (1993). Sherman had the opportunity to cross-examine Smith on the extent of his knowledge of the doctored MRIs, and the jury heard the controverted portion of the recording as evidence impeaching Smith's testimony on Sherman's knowledge. Under these circumstances, Sherman has not shown "a reasonable probability" that the failure to admit this portion of the testimony as substantive evidence "affected the outcome of the trial." *United States v. Clay*, 162 F.4th 757, 766 (6th Cir. 2025) (per curiam) (citation omitted); *see also Olano*, 507 U.S. at 734.

---

[2]Whether Smith or the informant made this latter statement is unclear from the record. Sherman's appellate briefing describes it both ways. *See* Appellant Br. at 9, 40. Because Sherman has failed to provide the court with a copy of the recording in question, we are unable to determine who made the second statement. In any case, neither understanding of the statement saves Sherman's argument.

To the extent that Sherman continues to press his non-hearsay rationale for admission, that argument is unavailing.**3**   Hearsay is an out-of-court statement "offer[ed] in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  Accordingly, when a proponent offers a statement to prove that the declarant or a listener had knowledge of the proposition asserted in the statement, rather than to prove the truth of that proposition, he has not offered hearsay.  *See United States v. Churn*, 800 F.3d 768, 776 (6th Cir. 2015) (noting that statement offered to show effect on the listener is not hearsay); *United States v. Boyd*, 640 F.3d 657, 664 (6th Cir. 2011) ("Statements offered to prove the listener's knowledge are not hearsay."); *see also* Fed. R. Evid. 803(3) (exception permitting hearsay that shows the "declarant's then-existing state of mind (such as motive, intent, or plan)").   In these circumstances, "[w]hether [the] statements were true or not [is] irrelevant to what the [proponent is] trying to show by introducing" the statement.  *Churn*, 800 F.3d at 776.  But, contrary to Sherman's claim, that does not mean that *any* "[s]tatements offered to show state of mind or knowledge are admissible" as non-hearsay.  Appellant Br. at 41.  For instance, when the statement is itself the assertion of an individual's knowledge or the inference thereof flows directly from the assertion, a party who offers that statement to show knowledge is offering hearsay.  After all, in that context, whether the statement is true or not is centrally relevant to its use by the proponent.  That's the case here.  The assertion that "[Sherman] would be ready to get the f[***] on" "if it was [Sherman] that caught [the false MRIs]," R. 276, Trial Tr., PageID 5241, 5244, was offered as stating "Dr. Sherman's lack of knowledge," Appellant Br. at 41.  It makes all the difference whether Sherman *would actually* "get the f[***] on" if or when he caught a false MRI.  Accordingly, the statement was hearsay and was inadmissible absent some

---

**3**In places, Dr. Sherman suggests that he should have had the opportunity to play the recording simply because the entirety of the recording was admitted into evidence on December 4, 2023.  *See* Appellant Br. at 39–40; *see generally* 1 David H. Kaye et al., *McCormick on Evidence* § 54 (9th ed. 2025) (where "testimony is received without objection, the testimony becomes part of the evidence in the case and is usable as proof to the extent of its rational persuasive power").  This question turns on whether the entire recording or only portions thereof were admitted as Exhibits 99A and 99B.  On reviewing the exhibits, we conclude that the controverted portion of the recordings was not admitted by the government.  And to the extent that Sherman argues that the court previously admitted the entire recording when it admitted "Exhibits 82 through 102" on November 20, 2023, *see* R. 219, Trial Tr., PageID 1410, the transcript index shows the familiar Exhibit 99A admitted on that day, *see id.* at 1359; *see also id.* at 1530 (permitting Ex. 99A to be played for the jury without objection).

exception to Rule 802.  Sherman does not argue that any such exception applies.  Thus, there is no error.

V.

Sherman argues that the district court erred when it permitted the government to use a series of Rule 1006 summary charts in presenting its case to the jury.  As before, this decision is reviewed for an abuse of discretion.  *United States v. Williams*, 952 F.2d 1504, 1519 (6th Cir. 1991).  In *United States v. Bray*, we identified five prerequisites for the admission of summary charts pursuant to Rule 1006.  139 F.3d 1104, 1109–10 (6th Cir. 1998).  As reiterated in later cases,

> (1) the underlying documents must be so voluminous that they cannot be conveniently examined in court, (2) the proponent of the summary must have made the documents available for examination or copying at a reasonable time and place, (3) the underlying documents must be admissible in evidence, (4) the summary must be accurate and nonprejudicial, and (5) the summary must be properly introduced through the testimony of a witness who supervised its preparation.

*United States v. Jamieson*, 427 F.3d 394, 409 (6th Cir. 2005) (citation modified).

Sherman first challenges the application of the second prong, that "the proponent of the summary must have made the [underlying] documents available for examination or copying at a reasonable time and place."  *Id.*  Sherman represents that the government "did not provide defense counsel adequate notice or access to the precise materials underlying the summary charts" and did not produce the summaries themselves until "mere days before trial."  Appellant Br. at 51.

At issue is a chart of the total number of prescriptions and pills issued by Sherman to patients at Tranquility Wellness Center.  The government's witness created this summary chart by cross-referencing data from the Michigan Automated Prescription System (MAPS), a comprehensive database tracking all prescriptions of Schedule II–V drugs and data from Tranquility Wellness Center's patient records.  The witness first filtered the MAPS data by Sherman's DEA number before again filtering it to include only recipients listed in the patient records.  Sherman does not appear to dispute that he was provided access to the underlying

MAPS and patient record data years before trial. Instead, the precise materials he seeks are the "culled MAPS report"—the "third list of patients [the witness] believe[d] were seen at Tranquility." R. 274, Trial Tr., PageID 4860–63. But this hypothetical intermediate document, if ever even created by the witness, is not one of the "underlying" documents being summarized in the chart. Fed. R. Evid. 1006(b). Therefore, it is not a document that the government had to produce as a condition of admitting the charts. And to the extent that Sherman objects to the late availability of the charts themselves, Rule 1006 does not obligate the government to make those available before use either. *See id.*; *Jamieson*, 427 F.3d at 409–10 (stating that "Rule 1006 does not require, however, that the government provide [the defendant] with a copy of the actual summary").

Sherman makes a glancing argument under *Bray*'s prong four, which requires that the "summary document 'must be accurate and nonprejudicial.'" 139 F.3d at 1110 (citation omitted). He objects that the charts' representation of Sherman's yearly income included $243,000 from an IRA distribution, which could have misled the jury into thinking that he earned excessive (and, therefore, likely illegal) income from the medical practice. But neither of the complained-of exhibits (Nos. 166 and 170) appear to have been admitted into evidence or shown to the jury. And to the extent that he meant to object to Exhibit 174, which seems to have contained the same income figures, his cross-examination of the witness on this point was adequate to clear up any potential confusion attendant to the government's accurate summary chart of Sherman's tax returns. The district court did not abuse its discretion.

VI.

Sherman next objects to Special Agent Napolitano's and IRS Agent Klein's testimony as impermissible lay testimony. As elsewhere, we review the district court's contemporaneously challenged evidentiary ruling for an abuse of discretion, reversing only "where the district court's erroneous admission of evidence affects a substantial right of the party." *United States v. White*, 492 F.3d 380, 398 (6th Cir. 2007). Lay witnesses are permitted to render opinions "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." *United States v. Kilpatrick*, 798

F.3d 365, 379 (6th Cir. 2015) (quoting Fed. R. Evid. 701).  For instance, "[w]hen an agent gives opinions that rely on the agent's specialized training as a law enforcement officer, that testimony is expert testimony, and the agent must be qualified under Rule 702," but "when an agent relies on his or her personal knowledge of a particular investigation," the agent renders an admissible lay opinion.  *Id.* at 384.

A.

Sherman first challenges the testimony of Agent Napolitano.  In the challenged portions of the testimony, Napolitano described the MAPS system, explaining that MAPS tracks the prescription of Schedule II–V drugs within the state.  He explained that the MAPS system uses the DEA's drug schedule, which the DEA bases on the drugs' "potential for addiction, abuse, and diversion."  R. 274, Trial Tr., PageID 4835.  And he explained that "oxycodone and oxymorphone" are Schedule II narcotics.  *Id.* at 4834–35.  The court then asked Napolitano to define "diversion."  *Id.* at 4835.  He did so: "The illegal sale and distribution of narcotic prescriptions."  *Id.*  Defense counsel raised no objection.  *See id.*  Accordingly, we review the admission of this testimony for plain error.  *United States v. DeJohn*, 368 F.3d 533, 540 (6th Cir. 2004).

Napolitano's testimony permissibly "relie[d] on his . . . personal knowledge of [Sherman's] investigation."  *Kilpatrick*, 798 F.3d at 384.  He explained in basic terms the tools he used to conduct the investigation—the MAPS system, and the Controlled Substance Act's "schedule" scheme.  And he defined the subject matter he investigates in the course of his job duties—"diversion."  He then described how he conducted his investigation using the MAPS data, Sherman's prescriber ID number, and Tranquility's electronic medical records; and he described a summary chart he prepared showing how many Schedule II drug prescriptions (and pills) Sherman had issued during a particular time period.  None of this testimony offered any opinion or conclusion on whether Sherman had prescribed these drugs illegally.  So there is no risk that, as Sherman claims, the jurors would "credit [Napolitano's] purported expertise on what 'real' prescribing . . . looks like."  Reply Br. at 10.  We see no error with admitting this testimony, plain or otherwise.

Agent Napolitano also testified that the three drugs that Sherman most commonly prescribed at Tranquility—oxycodone, oxycodone with acetaminophen, and oxymorphone—were the three "most commonly diverted prescriptions." R. 274, Trial Tr., PageID 4843. Defense counsel objected. At a sidebar, the government argued that Napolitano, with "five years of experience doing diversion cases," could testify to what he "most commonly see[s] diverted in his job duties." *Id.* at 4844. The court agreed. Asked again what medications "are more commonly sold on the street," "in [his] work experience," Napolitano then repeated the same testimony concerning oxycodone and oxycodone with acetaminophen. *Id.* at 4847.

We need not decide whether admitting this testimony was error because any error was harmless. We may not reverse on the basis of an evidentiary error where we have "'fair assurance' that the verdict was not 'substantially swayed' by the error." *United States v. Kettles*, 970 F.3d 637, 643 (6th Cir. 2020) (emphasis omitted) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). "[I]n criminal cases, it is for the 'Government to explain why an error should not upset the trial court's determination.'" *Id.* (quoting *Shinseki v. Sanders*, 556 U.S. 396, 410 (2009)). The United States has done so here. The testimony that the three drugs Sherman most commonly prescribed were also the most commonly diverted prescriptions was relevant to the question whether Sherman knowingly issued unauthorized prescriptions, but that evidence was a small part of an overwhelming mass of circumstantial evidence offered by the government. *See supra* Part II. What's more, Koczenasz testified to these same facts when presented with Napolitano's summary chart without objection from Sherman. *See* R. 276, Trial Tr., PageID 5298. And Darwin Smith, the owner of a pharmacy, testified that 30 milligram oxycodone pills were the most commonly filled prescriptions by those diverting drugs to street sale, again without objection by Sherman. The admission of inadmissible evidence is not prejudicial where "substantially equivalent evidence of the same facts had otherwise been admitted." *United States v. Robinson*, 389 F.3d 582, 593 (6th Cir. 2004). Given that testimony and the "overwhelming evidence of guilt beyond the erroneously admitted testimony," *United States v. Baldwin*, 418 F.3d 575, 582 (6th Cir. 2005), we conclude that any error was harmless.

B.

Sherman next challenges Agent Klein's testimony. In the challenged portions of Klein's testimony, she explained charts she had prepared summarizing Sherman's financial history on the basis of his financial records. But a witness's "summar[y]" of "a large amount of data" may be a task that "require[s] only everyday reasoning rather than specialized knowledge." *United States v. Faulkenberry*, 614 F.3d 573, 588 (6th Cir. 2010). In places, Sherman suggests that Klein's testimony must have fallen into the "expert" category because if it were merely "basic arithmetic" permissible by a lay witness, it would not have required summary charts or witness explanation. Appellant Br. at 47. That argument is unpersuasive. As with Rule 1006, a witness can describe materials whose volume or complexity makes them inconvenient for the jury to examine unaided, so long as every step of that description or summary requires nothing more than ordinary reasoning. *Cf. Kilpatrick*, 798 F.3d at 383 (concluding that law enforcement officers may "summarize voluminous writings or recordings"); Fed. R. Evid. 1006(a). Finally, Sherman accuses Agent Klein of implying that Sherman "amended his [tax] filings to conceal ill-gotten gains." Appellant Br. at 48. But Sherman does not cite any particular testimony to this effect, and our review of the record locates none. And any prejudice was adequately addressed by defense counsel's cross-examination on the issue. In sum, the district court did not err in admitting the testimony of Agents Napolitano and Klein as lay opinion testimony.

VII.

In his final stand-alone argument, Sherman alleges that the district court was impermissibly biased against him. At least two sources of law govern judicial bias. The Due Process Clause, the "outer boundar[y] of judicial disqualification[]," *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 889 (2009), requires recusal when "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable," *Rippo v. Baker*, 580 U.S. 285, 287 (2017) (per curiam) (citation omitted). A federal statute also requires a "judge of the United States" to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned" and, among other circumstances, where "he has a personal bias or prejudice concerning a party." 28 U.S.C. § 455(a), (b)(1).

Although Sherman's brief invokes due process in framing this claim, much of the caselaw he cites concerns § 455. *See id.* at 55–56 (citing, *e.g.*, *United States v. Liggins*, 76 F.4th 500 (6th Cir. 2023); *Liteky v. United States*, 510 U.S. 540 (1994)). To be fair, our cases have not always been clear about what law they apply. *See, e.g.*, *McMillan v. Castro*, 405 F.3d 405, 409–10 (6th Cir. 2005); *United States v. Hickman*, 592 F.2d 931, 932–34 (6th Cir. 1979). But the district court's conduct is unobjectionable even under § 455's more exacting standard. So we apply that law here.

Where a litigant objected below, we review a district judge's "conduct during a trial for an abuse of discretion." *McMillan*, 405 F.3d at 409; *accord Liggins*, 76 F.4th at 505. But where a litigant has not contemporaneously objected to the trial court's conduct, we review for plain error. *United States v. Hynes*, 467 F.3d 951, 957–58 (6th Cir. 2006). And though we do not apply that plain error standard "if raising a contemporaneous objection 'would have exacerbated the situation,'" *id.* at 958 (quoting *United States v. Sims*, 46 F. App'x 807, 814 (6th Cir. 2002)), Sherman does not explain how making an objection would have made things worse. He does not appear to have raised these objections orally at trial or to have pursued them in his motion for new trial. Accordingly, we review for plain error.

We have said that the presence of "outright bias or belittling of counsel is ordinarily reversible error," as is a trial "so infected with the appearance of partiality that the trial court's interjections must inevitably have left the jury improperly influenced." *McMillan*, 405 F.3d at 409–10 (citation modified). The same goes for conduct that occurs outside the jury's presence, at least where that conduct is "so extreme as to display clear inability to render fair judgment." *Liggins*, 76 F.4th at 506 (quoting *Liteky*, 510 U.S. at 551). But "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display" do not constitute hostility for these purposes. *Liteky*, 510 U.S. at 555–56. And "bias" does not include views formed about a litigant's case during the proceedings "unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* at 555.

Sherman alleges five statements or actions which show judicial hostility or bias. None does.

A.

First, Sherman takes issue with a remark the district court made to a prospective juror during voir dire. The juror was a former IRS employee who had previously testified as an expert witness before a grand jury. This colloquy followed.

> The Court: Do you believe there must be some merit to the charges or [the defendant] would not be on trial?
>
> Prospective Juror 7: I guess it depends on what the definition of merit is, but there's a reason there's a trial here.
>
> The Court: Yeah, there's definitely a reason. We didn't just—this isn't fake. It's not like that Netflix—if anybody saw that, that's not happening here.
>
> Prospective Juror 7: I just want to make sure we're not making it up.
>
> The Court: No. Okay. No, this is real. We're not making it up. And I understand that you've testified before a grand jur[y] and so on. But can you— Dr. Sherman starts with a clean slate. Do you understand that?
>
> Prospective Juror 7: Yes, I do.
>
> The Court: Because we're now at a different phase. We're not at the indictment phase. We're at a clean slate starting a trial. And is that something that you—
>
> Prospective Juror 7: I completely understand that, yes.
>
> The Court: Okay. Good.

R. 345, Trial Tr., PageID 6369–70. Defense counsel did not comment on or object to this exchange. But defense counsel later used a preemptory strike on the juror and he was excused.

When the court said that "there's definitely a reason" the trial was occurring, that statement coupled with the court's reference to Netflix, is most naturally read as an assurance that the trial wasn't "fake."[4] The court affirmed that the proceedings were real and that Sherman had been validly indicted. Then the court immediately sought the juror's understanding that, post-indictment, Sherman had "a clean slate" at this "different phase." No reasonable listener would have understood the court to have said anything contrary to a defendant's presumption of innocence or to project bias against Sherman or his counsel.

---

[4]The government suggests that the court was most likely alluding to a television series, *Jury Duty*, which depicted a fake trial in which all but one juror was an actor. *See Jury Duty* (Amazon Studios 2023). That series premiered on April 7, 2023, approximately seven months before the start of trial, though it ran on Amazon, not Netflix.

B.

Sherman next objects to remarks made during a sidebar conference, out of the jury's presence.  During the testimony of the government's expert, Dr. Berland, defense counsel indicated his interest in cross-examining Berland on the standard he had applied in a prior case on the theory that Berland was "holding Dr. Sherman to a much higher standard."  R. 267, Trial Tr., PageID 3364.  This exchange followed.

> The Court:  Ms. Furtaw?
>
> Ms. Furtaw [prosecutor]: Yes, Your Honor.  If I could just address.  Mr. Chapman [defense counsel] is sort of doing what he does best, which is plucking one small sentence out of—but be that as it may—
>
> The Court:  That's his job.
>
> Ms. Furtaw:  That's his job.
>
> The Court:  That's all he's got, so he's got to go with it.
>
> . . .
>
> The Court: I know.  But what is—that's fine.  But what is your point?  Everybody's just grasping right now.
>
> . . .
>
> The Court:  Okay.  And why is *Jankowski* not relevant in this case[]?  Focus.
>
> Ms. Furtaw:  Yes, Your Honor.  I apologize.
>
> The Court:  That's okay.
>
> Ms. Furtaw:  It's not relevant in this case because Dr. Jankowski was a different set of circumstances. . . .
>
> The Court:  That's okay.  And Mr. Chapman, I saw your reaction when I said— when she said you're grasping at straws or whatever it was.  And I said, well, that is your job.  Your job is to pick apart every little straw you can find.  And you're doing that job.  So I'm not faulting you for that.

*Id.* at 3364–66.  Defense counsel did not object to the district court's statement.

Sherman reads the district court's statement that all defense counsel had "to go with" was "grasping at straws" as expressing its view that his whole defense was insubstantial, but that is a strained interpretation.  In context, the court's remark refers only to defense counsel's objection to Berland's testimony; and it was the district court's job to form an opinion on that objection.

A district court does not display bias by overruling an objection or by characterizing it as weak. And that is especially so when outside the jury's presence. What's more, the court explained to the government that it is defense counsel's job to expose gaps in the government's case. And the court did not reserve its critique for defense counsel, instead the court simultaneously faulted the prosecutor for being unfocused and similarly "grasping." *Cf. McMillan*, 405 F.3d at 410 (noting that remarks critical of both parties outside the presence of the jury in response to counsel's conduct are eligible for harmless error review). These remarks in no way rise to the level of "a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky*, 510 U.S. at 555.

## C.

Third, Sherman takes issue with remarks the court made during oral argument on his motion for a judgment of acquittal.

> Mr. Chapman [defense counsel]: And I'll also just say that, your Honor, the notion that federal law enforcement can send a patient into a doctor's office and complain of significant pain and show subjective and objective findings of significant pain through falsified MRIs as well as falsified MAPS reports, the notion that a physician could be subject to that sort of treatment by the federal government or by these folks working at Tranquility is just plain offensive and causes injury to the medical system as a whole.
>
> Physicians are not in a position, and nor do we want them in a position, to have to be police officers investigating the legitimacy of a prescription. They should have a truth bias and be caretakers and not being responsible for knocking down the false statements or investigating the false statements of patients for law enforcement.
>
> The Court: You know, I love this story. I love what you're saying. You know, it's a heart—you know, it's pulling at the heart strings and all, but here's the problem with it, which is that this particular type of medical practice is prescribing highly addictive, death-causing opioid prescriptions, that, in addition to being highly addictive, also have a street value, also have a known history of being diverted into the streets and killing people.
>
> So it's not an everyday medical practice where a mother or father brings a child for a strep test, and oh, you've got to be on the lookout, there might be—you do have to look for Munchausen's, but setting that aside[, l]et's look down the throat. Oh, I better look three times because I might get caught for diagnosing strep throat. That's not this case. So that argument is not effective.

> I want every doctor in this country to be on the lookout for addiction [that's] causing more harm than good.  So just in terms of the policy argument you're making, I don't think it's related to the facts of this case.
>
> Mr. Chapman:  Understood, your Honor.

R. 276, Trial Tr., PageID 5401–02.  Sherman did not object to these statements and continued with his argument on other points.

Sherman compares this case to *United States v. Liggins*, claiming that, in that case, we reversed a district judge's denial of a motion to recuse after the court told the defendant that he "looks like a criminal to me" and highlighted that "[h]e's alleged to be dealing heroin, which addicts, hurts and kills people."  76 F.4th at 503, 506–07.  But only half of that claim fairly represents our holding in *Liggins*.  In *Liggin*s, we held that the district court had crossed the line by saying that the defendant "looks like a criminal."  *Id.*  But the district court here said nothing remotely like that.  And the court's remarks about the harm caused by the heroin trade did not factor in our analysis in *Liggins*.

Nor do the district court's remarks prejudge Sherman's guilt.  The court instead responded to defense counsel's argument by describing the risks attendant to opioid prescriptions by any doctor and then explained why, in the court's view, those risks justify an expectation that doctors remain vigilant for patients who fake symptoms or medical history to receive an opioid prescription.  Those statements do not demonstrate a bias against Sherman.

### D.

Fourth, Sherman objects to remarks the court made during his sentencing hearing.  For context, Sherman had previously worked as a doctor in the Macomb County, Michigan jail system.  *See generally Preston v. County of Macomb*, 2019 WL 9899918, at *1 (E.D. Mich. Feb. 19, 2019).  During that time, Sherman, among others, was sued by a detainee who had given birth to a child on the floor of the jail.  *See id.*  The same district judge presided over that case, ultimately dismissing the suit as against Sherman for failure to state a claim.  *See id.* at *9–10.  It appears that some individuals who wrote letters on Sherman's behalf before his sentencing

hearing in this case invoked his work in the jail system as evidence of his good character. After discussing Sherman's violation of his Hippocratic oath, the district court continued:

> The Court: Your letter writers drew my attention to your time at Macomb County Jail. I was aware of that, of course, because I presided over the case where you were sued for deliberate indifference in that jailhouse because of the birth of a baby by a detainee, Jessica Preston, on the jail floor.
>
> Your letter writers didn't know about that. They didn't have knowledge of those accusations. I ultimately dismissed you from that suit. And this case has nothing to do with that case. But it gave me some insight into what you had told your letter writers about your time at Macomb County. None of them mentioned that tragic and difficult instance where a woman gave birth to her child . . . in jail.

R. 325, Sentencing Tr., PageID 5980. The district court went on to explain that "the letters that have the greatest impact on me are the letters where the individuals acknowledge the seriousness of the crime and say yet and still, Dr. Sherman deserves the Court's grace." *Id.* Instead, "these letters didn't say anything [of the sort]." *Id.* "They painted a picture of Dr. Sherman as the utmost ethical, the highest achiever in the profession. And they didn't acknowledge [his wrongdoing]." *Id.* Defense counsel did not object to or comment on the court's statements.

The district court later sentenced Sherman to a mid-range term of 144 months' imprisonment. The court asked whether defense counsel had "any objection to the sentence that has just been pronounced that you've not previously set forth?" *Id.* at 5986. Counsel responded, "Nothing beyond what we've spoken about today, Your Honor." *Id.* at 5987.

We are unconvinced that the court's statements evidence impermissible "judicial fact-finding" or "personal disdain." Appellant Br. at 65, 66. The Supreme Court has said that "opinions held by judges as a result of what they learned in earlier proceedings" are "not subject to deprecatory characterization as 'bias' or 'prejudice.'" *Liteky*, 510 U.S. at 551. Here, the district court invoked the defendant's connection with the prior civil suit to highlight the limited usefulness of letters that reflected a selective knowledge or focus. The court was clear that other than the "insight into what you had told your letter writers," "this case has nothing to do with that case." *Id.* at 5980. Consequently, a reasonable observer would not conclude that the district court's knowledge of the allegations in the prior civil case improperly influenced the court's

view of the defendant's criminal culpability beyond permissibly blunting the mitigating impact of his letters of support.

E.

Finally, Sherman argues that the ten-month gap between the completion of briefing on his motion for new trial and the district court's resolution of that motion shows judicial bias. *Compare* R. 302, Reply to Resp. (filed on Mar. 22, 2024), *with* R. 339, Op. & Order (filed on Jan. 12, 2025).  We are unconvinced.  District courts are afforded broad discretion to manage their dockets. *Cf. Am. Civil Liberties Union of Ky. v. McCreary County.*, 607 F.3d 439, 451 (6th Cir. 2010).  A ten-month delay in ruling on a complex motion, while perhaps not ideal, is sometimes necessary and not unusual.  And we are unwilling to fault the district court for taking its time with a thorough, fact-intensive 68-page opinion addressing the product of a five-week trial.

* * *

When it comes to finding judicial bias:

> [a]ll of [Sherman's]　grounds are inadequate under the principles we have described above: They consist of judicial rulings, routine trial administration efforts, and ordinary admonishments . . . to counsel . . . .　All occurred in the course of judicial proceedings, *and* neither (1) relied upon knowledge acquired outside such proceedings nor (2) displayed deep-seated and unequivocal antagonism that would render fair judgment impossible.

*Liteky*, 510 U.S. at 556.  Sherman's claim of judicial bias fails.

VIII.

Sherman argues that though the errors alleged here might be "considered harmless when viewed in isolation of each other," they require reversal "when considered cumulatively." *Campbell v. United States*, 364 F.3d 727, 736 (6th Cir. 2004).  In denying Sherman's motion for a new trial, the district court dismissed this argument because it concluded that no errors were present and thus there were no errors to cumulate.

But we rested our analysis of some issues on the absence of *reversible* error. Without deciding whether there was error, we concluded that any error in admitting some of Napolitano's lay testimony was harmless. *See* Part VI.A. And in Part IV above, we concluded that no plain error was present because, even assuming a violation of the rule of completeness, no substantial prejudice flowed from that decision.

Even assuming that both of these decisions were error, and even considering them cumulatively, we conclude that their combined effect would not undermine confidence in the jury's verdict. These two pieces of either admitted or excluded testimony, neither more than two sentences in length, do not imperil the outcome of this five-week trial. As before, the "overwhelming evidence of guilt beyond the erroneously admitted testimony," *Baldwin*, 418 F.3d at 582, assures us that Sherman was not "deprived . . . of a fair trial," *Campbell*, 364 F.3d at 736 (citation omitted).

IX.

Finally, Sherman appeals the denial of his motion for new trial, incorporating by reference his arguments on the issues above, save those that relate to the sufficiency of the evidence. We review the denial of a motion for new trial for an abuse of discretion, granting a new trial only where the "interest of justice" so requires. *United States v. Munoz*, 605 F.3d 359, 366, 373 (6th Cir. 2010) (citation omitted). Justice will require a new trial where "substantial legal error has occurred." *Id.* at 373.

For the reasons given above, no substantial error occurred here. Accordingly, the interests of justice do not require a retrial.

\* \* \*

We AFFIRM.